# MANAGEMENT SERVICES, Inc., v. GEORGE HELL-MAN, JR., Adm'r, etc.—289 S. W. (2d) 711.

Eastern Section. August 24, 1955.

Petition for Certiorari denied by Supreme Court, December 9, 1955.

Jennings, O'Neil & Jarvis, and Paul E. Parker, Knoxville, Walter C. Rothermel, Oak Ridge, for plaintiff.

Kramer, Dye, McNabb & Greenwood, Knoxville, Prince & Woodside, Oak Ridge, for defendant.

HOWARD, J. Referring to the parties as they appeared below, this action was filed by the Administrator herein, George Hellman, Jr., against the defendant, Management Services, Inc., for damages for the alleged

wrongful death of plaintiff's minor son, William Kent Hellman, age 8 years, who died as a result of an injury sustained under circumstances hereinafter appearing. The suit was for the use and benefit of Hellman and his wife, Mary R. Hellman, the surviving parents of the decedent.

The record discloses that prior to and on July 12, 1952, the defendant operated a large swimming pool at Oak Ridge, Tennessee, where daily during the summer season several hundred adults and children paid regular entrance fees to sun bathe and swim. The pool was hexagon shaped and was surrounded by a concrete apron several feet wide on which patrons could walk or lounge, and surrounding the entire area was a high wire mesh or cyclone fence. On the concrete apron, but located at different points around the pool, were 5 or 6 life guard towers several feet high, from which the life guards had a clear view of the pool and surroundings. On the east side of the pool near the entrance were bath houses and the two diving boards, and on the north there was a beach and grassy plot, the water in this area of the pool being shallow for small children and those who could not swim. Prior to opening the pool on June 1, 1952, the defendant closed off the western area of the pool to the public by tying ropes across the spaces of approximately 4 feet between the fence and the two westernmost life guard towers on the north and south sides of the pool. These ropes were about the size of an ordinary window sash cord and were from 3 to 3½ feet above the concrete apron, and there were no signs or warnings to the public that this area had been closed off.

On the date of the accident about 4 P.M., Hellman, accompanied by his wife, their 16 year old daughter, Anna

Gale, and her friend Glenda Shook, also age 16, their son, George, age 11, and the decedent, went to the defendant's swimming pool for an outing, all of them dressing in their bathing suits before leaving home, and on reaching the pool Hellman paid the required entrance fees for the entire party. After being in the water for some time the decedent, who could not swim, complained of being cold and his father took him out to get a towel to put around his shoulders. Thereafter while they were standing on the concrete apron near the high diving board watching the divers, the decedent asked his father's permission to move closer (south) to the low diving board where children his age were swimming and diving, which permission was granted. Thereafter, Hellman remained near the high diving board where he could observe his wife and other members of his family on the north side of the pool. Meantime he did not see the movements of his son who stopped for only a short time at the low diving board before he started running in a westwardly direction on the concrete apron, with the apparent intention of going around the western area of the pool to the north side to join his mother, and on reaching the westernmost life guard tower he ran into the rope heretofore described, which cut off the unused portion of the pool. On striking the rope the decedent was knocked to the concrete apron, his head striking the pavement, causing him to suffer a skull fracture extending from the back of his right eye to the upper portion of his ear. Several hours after the accident other complications developed and a blood clot more than an inch in thickness formed on the child's brain. This resulted in unconsciousness and an operation followed at the Oak Ridge Hospital, during which he died at 2 A.M. on the morning of July 13th.

Plaintiff's declaration alleges in substance that the defendant's agents were negligent in placing or stretching the rope, without warning signs attached thereto, across the passageway at such height as to strike plaintiff's son about the neck or chin, thereby stopping his forward movement and throwing him back onto the concrete pavement with great force; that the defendant was negligent in failing to warn its patrons and more particularly plaintiff's son of the presence of said rope, and that the defendant's agents knew or by the exercise of ordinary care should have known that the placing and maintaining of the rope across the passageway was dangerous and created a dangerous condition.

Upon being ordered to plead its defenses specially, the defendant filed the following special pleas:

"That the swimming pool * * * was constructed and maintained so as to meet and fully comply with the highest standards of safety pertaining to public swimming pools * * *."

"That at the time * * * that portion of the pool * * * closed to the public had been roped off and signs placed upon the ropes notifying the public that portions had been closed. A rope had been placed across the walkway surrounding the pool near the southwest portion thereof and stretched from the lifeguard stand to the fence enclosing the entire pool. Attached to this rope, which was plainly visible to persons using the pool, was a large metal sign with black painted letters on a white background reading 'This Section of Pool Closed'. That this sign, which was attached to the rope heretofore mentioned, was also plainly visible."

"That the closing of portions of public swimming pools to the public by roping off a portion thereof and the placing of signs upon said ropes is a recognized thing the country over and that in so doing this defendant was acting in full compliance with the highest standards of safety pertaining to the operation of public swimming pools."

The defendant specifically denied that it was under any duty to warn plaintiff's son or "any other person present of said rope"; denied that he struck the rope about his neck or chin, or that he was thrown with great force onto the concrete, and denied that he died from "injuries wrongfully inflicted on him by this defendant."

The defendant also relied upon the decedent's contributory negligence, the contributory negligence of his parents for whose use and benefit the suit was brought, and upon a rule prohibiting patrons from running upon the premises, averring as follows:

"At approximately 5:45 P. M. on the day in question, the boy left his father and traveled in a westwardly direction along and over the apron surrounding the pool. At a point along the way the boy began to run and a lifeguard on duty reached for his whistle to warn the boy not to run. The boy fell. Personnel employed at the pool immediately went to the assistance of the child who was crying and holding his forehead, but who had no discernable marks, bruises, cuts or abrasions about his head, body, or limbs. Thereafter the boy joined his father who for sometime had been standing at a point some 100 feet away from the place where the boy fell."

At the conclusion of all the evidence a motion made on behalf of the defendant for peremptory instructions was overruled, and the trial resulted in a jury verdict for the plaintiff for $35,000. On the hearing of the defendant's motion for a new trial a remittitur of $15,000 was ordered by the trial judge, which the plaintiff accepted under protest, and the motion was overruled. Thereafter both sides perfected appeals to this Court and errors have been assigned which will hereinafter be considered.

 Under assignment 1, the defendant insists that (a) there was no material or competent evidence of negligence to sustain the verdict, (b) there was no material or competent evidence that the child struck the rope, and (c) the parents of the decedent were guilty of contributory negligence as a matter of law, and that the trial court should have sustained its motion for a directed verdict on these grounds. In ascertaining whether there was any material evidence to support the verdict, we are required to take the strongest legitimate view of all the evidence favorable to plaintiff, disregard all inferences to the contrary, and indulge all reasonable inferences to uphold the verdict. Jarratt v. Clinton, 34 Tenn. App. 670, 241 S. W. (2d) 941; D. M. Rose & Co. v. Snyder, 185 Tenn. 499, 206 S. W. (2d) 897, 901.

Only where one conclusion can be reasonably reached from the evidence and inferences is it proper for a trial court to direct a verdict. Coca-Cola Bottling Works v. Selvidge, 4 Tenn. App. 558; Supreme Liberty Life Ins. Co. v. Pemelton, 24 Tenn. App. 576, 148 S. W. (2d) 1.

With reference to directing a verdict in tort actions, our Supreme Court, in Jackson v. B. Lowenstein & Bros., 175 Tenn. 535, 136 S. W. (2d) 495, has said:

"Appellate courts should not lightly assume primary duty for determining liability or non-liability in actions of tort, but should leave such duty with the jury as triers of facts, and if they act arbitrarily courts should then supervise their action."

With the foregoing rules in mind, we have carefully reviewed the record, and it is our conclusion that the case was properly submitted to the jury.

According to the evidence, the rope described as being small, about the size of a "window sash cord" or "lead pencil," had been exposed to the weather for about 6 weeks, and was "weather beaten"; that being a neutral color it blended with the color of the fence, the concrete pavement and the post of the life guard tower to which it was tied, making it difficult to see; that the decedent who was from 3 to 3½ feet tall and weighed about 100 pounds, was at the time traveling in a westwardly direction facing the sun, and when his head struck the concrete there was a thud and he screamed. His scream not only attracted the attention of his father and mother, but his scream as well as the thud likewise attracted the attention of Edwin Hutto, age 37, who was standing on the concrete several feet away near the ladder at the southeast corner of the pool, and describing what he heard and saw, Hutto testified:

"Q. Did you hear anything or see anything that attracted your attention? A. I heard the child when he fell; I heard the noise.

"Q. What was the noise like? A. Oh, it is hard to describe—a kind of thud.

"Q. A thud? A. Yes, I would call it that if that describes it good enough. * * * It was a kind of thud,

something like something solid hitting something. No ringing sound or anything but it was an impact.

"Q. You heard the thud. What did you hear next? A. A scream.

"Q. Did you look then? A. Yes, I was looking when he screamed.

"Q. Where was the child lying, what was his position, Mr. Hutto, when he screamed? A. On his back.

"Q. Was he lying flat down on his back? A. Yes.

 \* \* \* \* \* \*

"Q. Without me leading you, and without your getting down on your back, can you tell us just where he was? A. He was in the section where you walk between the tower and the fence, lying on his back, apparently looking up. That is the best I can describe it.

 \* \* \* \* \* \*

"Q. Mr. Hutto, did you look to see what had caused the child's downfall? A. Yes, I could—I knew what had happened. \* \* \*

 \* \* \* \* \* \*

"Q. Tell what you saw there, Mr. Hutto. A. I saw the boy directly under this rope, \* \* \*.

 \* \* \* \* \* \*

"Q. Mr. Hutto, was there any sign, any metal sign, suspended from the rope in that area? A. In the area between the fence and the tower? There was nothing on the rope.

"Q. Was that the only place a person could pass there, going behind that tower? A. It was. That is, on the south side. They could go completely around.

"Q. Surely they could go all the way around the pool, but I mean if they wanted to go between the guard tower and the fence? A. That is the only way they could go.

\* \* \* \* \* \*

"Q. What was the color of that rope, and what was the size of it? A. I never got closer than twenty-five or thirty feet. I would describe it as sash cord, probably slightly weathered in color. That is the best I can describe it.

"Q. That was a sunshiny afternoon? A. Yes. If it had not been, I would not have been at the pool. I am positive it was.

"Q. Assuming a person was walking in the direction of this guard tower where the rope was suspended, where would the sun be, if a person was going in that direction? A. It would be directly in front of him."

This witness further testified that four people, including the life guard, went immediately to the aid of the injured boy who was assisted to his feet by a teenage girl and one of the others present, apparently his sister and Glenda Shook, and that as they passed him leaving the pool the boy was still "whimpering".

Mrs. Hellman, the decedent's mother, who at the time of the accident was on the north side of the pool with the other children, testified that she recognized her son's scream and looking in the direction from whence it came

she saw Kent sitting on the concrete pavement beside the life guard tower just east of the rope with his knees drawn up and his head in his hands; that she immediately told her daughter, Anna Gale, and Glenda Shook to go to his assistance, which they did by going around the western area of the pool that was closed off; that within only a minute or two after Anna Gale and Glenda had assisted Kent to his feet she met them on the east side of the pool near the entrance, and while Kent was still crying and complaining about his head hurting he remarked "I ran into the rope and it knocked me down." Mrs. Hellman further testified that she did not see the rope until after the accident, and she described it as being small and grayish or neutral in color with no warning signs attached to it.

The plaintiff, George Hellman, Jr., who was watching his wife on the north side of the pool when the accident occurred, testified that his attention was attracted by his son's scream, and on looking in that direction he saw Kent sitting on the concrete on the south side of the pool beside the life guard tower, with his head in his hands and his knees drawn up under him; that he did not go to his son immediately because there was a man kneeling over him and he saw his daughter, Anna Gale, and Glenda Shook approaching from the western side of the pool; that after Anna Gale and Glenda had assisted Kent to his feet, he met them near the low diving board, and that as they approached Kent, who was still crying and complaining about his head, remarked, "I ran into the rope and it threw me down and I bumped my head,"; that he then for the first time saw the rope which was only a few feet away, and that there were no warning signs of any description on either the rope or the tower. He

likewise described the rope as being small, about the size of an ordinary "lead pencil", and that its height struck his son about the top of the neck or throat. The accident occurred between 5 and 6 o'clock P. M.

Anna Gale Hellman and Glenda Shook, who were with Mrs. Hellman on the north side of the pool when Kent screamed, testified that Mrs. Hellman told them to go to him immediately, which they did, by running around the western (closed off) end of the pool. They both stated that no warning signs were attached to either of the ropes or towers closing off the western area of the pool, that they almost ran into the rope across the passageway on the north side before seeing it, and that they ducked under the rope on the south side before reaching Kent. They both described the ropes as being very small and grayish in color, similar to the fence and tower post to which they were tied, and were not easy to see.

These witnesses further testified that immediately after hearing Kent scream they saw him in a squatting position on the concrete only a few feet (east) from the rope holding his head in his hands, and on reaching him he was still in this position and was "screaming" or "crying"; that Glenda was the first person to reach him, then Anna Gale and immediately thereafter a man and one of the defendant's life guards, both of whom were unknown to them; that after they both helped Kent to his feet and while walking toward the entrance of the pool where they first met his father and then his mother, he continued to cry and complain of his head hurting, and that this continued for some time thereafter. They also testified that after reaching Kent, Anna Gale was the first person to speak to him, and describing what occurred Anna Gale testified, as follows:

"After we got to him, he was down in a squatting position on the concrete; he was holding his head, and was crying. Immediately when any one in the family got hurt, we always ask what happened, and I said 'Kent, what happened?' and he said * * * 'I ran into the rope and I fell down.' "

In addition to the testimony of the foregoing witnesses, there were admissions supporting the plaintiff's theory that the child struck the rope.

One of the defendant's part-time managers, Stanley R. Ashton, testified without objections that he learned that the boy ran into the rope, but did not know the seriousness of his injury at the time, and as previously pointed out, the defendant in its special plea averred that "* * * on the day in question the boy left his father and traveled in a westwardly direction along over the apron of the pool. At a point along the way the boy began to run and a life guard on duty reached for his whistle to warn the boy not to run. The boy fell."

The life guard on duty at the time did not testify, and his absence was unexplained by the defendant. He seems to have been in a better position than anyone else to know how the child was injured, and under these circumstances it may be presumed that the true facts, if disclosed by him, would be adverse to the defendant's contention on this crucial point. National Life & Acc. Ins. Co. v. Eddings, 188 Tenn. 512, 221 S. W. (2d) 695; Kidd v. Tennessee Gas Co., 33 Tenn. App. 302, 231 S. W. (2d) 793; Marable v. State ex rel. Wackernie, 32 Tenn. App. 238, 222 S. W. (2d) 234.

Though insisted here, as it was below, that none of the several hundred patrons who had previously visited

the defendant's pool were ever injured by the rope, none of these patrons were introduced as witnesses to contradict the testimony of plaintiff's witnesses that the ropes were very small and difficult to see, and there was no evidence that any warning signs were attached thereto. Nor was there any evidence that the parents of the decedent saw the rope or knew of its existence before the accident occurred, and under the circumstances their contributory negligence, if any, was not a question of law but was a question of fact for the determination of the jury under the instructions of the trial court. Likewise, whether the rope was obvious and unconcealed, as insisted on behalf of the defendant, or was hidden and latent, as insisted on behalf of the plaintiff, were questions for the determination of the jury, as also was the question of the defendant's negligence.

The rule is well settled that where the evidence is in conflict or, as here, where different conclusions might reasonably be drawn therefrom, questions of negligence, ordinary care and proximate cause are for the jury. Southeastern Greyhound Lines v. Groves, 175 Tenn. 584, 136 S. W. (2d) 512, 127 A. L. R. 1378; McBroom v. Southeastern Greyhound Lines, 29 Tenn. App. 13, 193 S. W. (2d) 92.

While proprietors of public swimming pools are not insurers of the safety of its patrons, they are required under our decisions to exercise ordinary care to keep the premises in a reasonably safe condition. Green v. Crescent Amusement Co., 32 Tenn. App. 554, 223 S. W. (2d) 201; Loew's Nashville & Knoxville Corp. v. Durrett, 18 Tenn. App. 489, 79 S. W. (2d) 598. And the care required must be proportionate to the danger known or reasonably to be apprehended and commensurate with the circum-

stances and risk of the situation. Whirley v. Whiteman, 38 Tenn. 610; Crescent Amusement Co. v. Byrne, 3 Tenn. App. 425; 86 C. J. S., Theaters and Shows, sec. 42, p. 728.

In Whirley v. Whiteman, supra, it was held that children of tender years are entitled to a degree of care from others proportioned in their inability to foresee and avoid the perils which they may encounter, and ''what would be but ordinary neglect in regard to one whom the defendant supposed to be a person of full age and capacity, would be gross neglect as to a child, or one known to be incapable of escaping danger.''

In Crescent Amusement Co. v. Byrne, supra, the Court said:

''Children, wherever they go, must be expected to act upon childish instincts and impulses; and others who are chargeable with a duty of care and caution towards them, must calculate upon this, and take precaution accordingly.'' (Citing cases.)

Likewise it appears to be an established rule that notice or warning of danger is required where the danger is hidden or latent, and where such danger is known to the owner or proprietor, or in the exercise of reasonable care could have been known or foreseen by him. 86 C. J. S., Theaters and Shows, sec. 42, pp. 730, 734; 38 Am. Jur. Sec. 97, p. 757; 20 A. L. R. (2d) 24. Accordingly this assignment is overruled.

Assignment 2, complaining because the trial judge admitted in evidence over the defendant's objections plaintiff's Exhibits 1, 5 and 6, will likewise be overruled. These Exhibits were photographs of the life guard towers taken sometime after the accident, and their admissibility was objected to on grounds that they

showed a changed condition of the premises. It was undisputed that the towers were of a grayish color at the time of the accident, and that the posts were subsequently repainted in alternating stripes of black and white as indicated by the photographs. This repainting changed the appearance of defendant's premises in only one particular, and this was explained to the jury. In all other particulars the photographs gave a correct picture of the conditions existing at the time of the accident. "The fact that there have been changes in conditions, including even substantial changes, will not necessarily exclude a photograph where the changes can be and are explained, so that the photograph, as explained, will give a correct understanding of the condition existing at the time to which the controversy relates, and be practically instructive." 32 C. J. S., Evidence, sec. 715, p. 623. The fact that a photograph is incorrect in some particulars does not render it inadmissible as evidence, but merely affects its weight. Hughes v. State, 126 Tenn. 40, 148 S. W. 543. Here the instrumentality that caused the fatal injury was the rope, and the defendant's argument that the jury inferred that the defendant, by repainting all of its towers, was remedying a defective condition, is mere speculation. Moreover, the admissibility of the photographs in question was a matter to be determined by the trial court in the exercise of his sound discretion. Monday v. Millsaps, 37 Tenn. App. 371, 264 S. W. (2d) 6; Strickland Transp. Co. v. Douglas, 37 Tenn. App. 421, 264 S. W. (2d) 233; 32 C. J. S., Evidence, sec. 716, p. 625.

Assignments 3 and 4 complain because the trial court admitted in evidence, over the defendant's objections, the three statements made by the injured child immediately after the accident to his sister, to his father,

·and to his mother, as follows: "I ran into the rope and I fell down"; "I ran into the rope and it threw me down and I bumped my head"; and "I ran into the rope and it knocked me down." These statements were admitted in evidence as a part of the res gestae. It is insisted that the statements should have been excluded on the grounds that they were (1) not spontaneous, and (2) elicited.

As heretofore pointed out, the first statement by the injured child was made to his sister immediately after she and Glenda Shook reached him, at which time he was sitting or squatting on the pavement beside the tower ·with his head in his hands and was "screaming" or "crying." This occurred only seconds after he was injured. The other two statements were made to his father and mother, after his sister and Glenda Shook had helped him to his feet and were walking him toward the entrance of the pool, within only a minute or two after the accident and while he was still crying and complaining of his head hurting. Under the circumstances the injured child, who was only 8 years of age, was not influenced by any ulterior motive. He was still laboring under the effects of his injury, which precluded the idea of fabrication or deliberate design.

"It is quite generally held that statements of one injured made a few minutes after the accident, and while the declarant is suffering such pain and is under such excitement as to preclude any reasonable possibility of fabrication, are, as a rule, admissible as part of the res gestae." National Life & Acc. Ins. Co. v. Follett, 168 Tenn. 647, 80 S. W. (2d) 92, 99.

Nor should the injured boy's statement have been excluded because it was elicited by his sister, who asked him what was the matter. It was an explanation of why he was sitting or squatting on the concrete crying and holding his head. See Riverside Mill Co. v. Parsons, 176 Tenn. 381, 141 S. W. (2d) 895; Highland Coal & Lumber Co. v. Cravens, 8 Tenn. App. 419. Furthermore, the trial judge possesses wide discretion in ruling on the admissibility of evidence offered as a part of the res gestae, and where the admissibility of the evidence is doubtful, it should go to the jury who may determine its weight. Riverside Mill Co. v. Parsons, supra; Garrison v. State, 163 Tenn. 108, 40 S. W. (2d) 1009; Kennedy v. Southern Railway Co., 2 Tenn. Civ. App. 103.

Assignment 5 complaining because the trial court admitted in evidence, over the defendant's objections, portions of the testimony of Anna Gale Hellman and Glenda Shook, is likewise without merit. The substance of the testimony objected to was that the rope stretched across the passageway on the north side of the pool was similar to the rope on the south side where the boy was injured; that no signs were attached to the rope on the north side, that it was difficult to see, and that they, on their way to the injured boy, almost ran into this rope. It is argued that the admitted testimony introduced collateral issues into the case which prejudiced the minds of the jury against the defendant.

As previously pointed out, the defendant in its special pleas averred that the swimming pool was constructed and maintained so as to meet and fully comply with the highest standards of safety pertaining to swimming pools, and that signs had been placed "upon the ropes, notifying the public that portions had been closed."

Under the issues raised by the defendant's special pleas, we think that the testimony objected to was admissible since it had a bearing upon the question of (1) whether or not there were any signs attached to the ropes, and (2) upon the defendant's negligence. Furthermore, the appellate courts of this state will not set aside a judgment on grounds of "improper admission or rejection of evidence" unless it shall affirmatively appear that the alleged error affected the results of the trial, and here there has been no such affirmative showing. Code secs. 10653, 10654.

 Assignment 6 complains of the following portion of the trial court's charge:

"If you find in favor of the plaintiff, it would be your duty to go further and assess his damages in such sum as in your sound judgment and discretion the facts warrant and *would justly compensate the plaintiff for the injuries suffered,—or the damages suffered. In that connection you would consider the pecuniary value of the life of the deceased to the beneficiaries, in this case, the parents;* in this connection the life expectancy and the age, condition of health of the deceased; the pain and suffering that plaintiff's intestate may have undergone. In other words, what sum would represent the life, or what sum of money the pecuniary value of the life of plaintiff's intestate. (Emphasis supplied.)

It is argued on behalf of the defendant that the jury could have inferred from the emphasized portion of the charge that both the father and mother should be compensated for their grief and suffering over the loss of their son; that "Nowhere in the charge did the court tell the

jury that the mental and emotional suffering of the parents or the loss of companionship of the child or the sentimental loss of the beneficiaries were not elements of damages for which compensation could be allowed.'' This argument is based on mere probability and not on fact.

At the conclusion of the general charge, it appears that the defendant was not only afforded an opportunity to submit special requests, but expressly declined after it was suggested by the trial judge, as indicated by the record, as follows:

"At the conclusion of the Court's charge, the Court asked of counsel if there were any special requests. Whereupon, the plaintiff submitted its special requests in writing, five in number. Thereupon, after reading said special requests, the Court requested counsel to meet with him in the library of the Anderson County Bar in a room adjacent to the Courtroom at which time the following proceedings were had in the absence of the Jury who for convenience remained in the Courtroom by consent of parties.

"The Court: What do you think Mr. Kramer, of these requests?

"Mr. Kramer: I believe that the Court would commit error if the requests were given to the Jury. In my opinion the Court has already committed error with respect to his charge as it applies to the measure of damages.

"Thereupon a discussion was had with respect to the Court's charge and the Court read from his

notes that portion of the charge where he had charged the jury with respect to the measure of damages in the event the plaintiff was entitled to a recovery, and stated that this was the only charge he had ever given to the jury and that he had used same over a period of years without objection. Thereupon, the Court inquired of Mr. Kramer as to what he considered a correct charge to be and wherein he claimed the charge of the Court was erroneous as given. And thereupon Mr. Kramer stated in effect that unlike, as required by rules of Federal Court, there was no obligation under state practice to at that time point out the alleged error. During the course of the discussion the Court was presented Code Section 8240 of the Code of Tennessee and said code section was read by all parties and discussion was had with respect thereto. The Court stated that he would let the charge stand as it was given and that he would refuse all of the special requests of the plaintiff and, thereupon, the Court and counsel returned into open court.''

It is an established rule in this state that it is the duty of counsel by suggestion or special request to bring to the attention of the trial judge any amplification of his charge, or if the language be equivocal to ask for removal of the doubt by proper instructions. Pollard v. Beene, 20 Tenn. App. 83, 95 S. W. (2d) 942; Hayes v. Cheatham, 74 Tenn. 1; National Life & Acc. Ins. Co. v. Morrison, 179 Tenn. 29, 162 S. W. (2d) 501; Haley v. Ogilvie, 2 Tenn. App. 607; Carney v. Cook, 158 Tenn. 333, 13 S. W. (2d) 322, 325.

In considering this question our Supreme Court in Carney v. Cook, supra, said:

"* * *, counsel engaged in a trial should aid the court by calling his attention to an abstraction or an inadvertence in delivering his instructions to the jury, and, where they fail to do so, this court will not reverse unless convinced that the party complaining was prejudiced by such instruction, or that justice is about to miscarry."

Moreover, errors based on probabilities are not grounds for reversal of a judgment, but there must be an affirmative showing that the alleged error affected the results of the trial. Code sec. 10654. Johnson v. McCord, 36 Tenn. App. 14, 251 S. W. (2d) 144.

Finally, (1) is the judgment excessive, as insisted on behalf of the defendant, and (2) did the trial court commit error in ordering a remittitur of $15,000, as insisted on behalf of the plaintiff. We think not, and for reasons hereinafter appearing we are constrained to affirm the judgment for $20,000.

Besides the great physical pain and intense agony which the decedent suffered for approximately 3 hours before going to the hospital, he had a life expectancy of 58.92 years, and the medical and funeral bills totaled $1,091.75.

In Southern Queen Mfg. Co. v. Morris, 1900, 105 Tenn. 654, 58 S. W. 651, it was held that a judgment for $7500 was not excessive for a boy 17 years of age who was killed by being caught in the defendant's machinery.

In Cheek v. Fox, 1917, 7 Tenn. Civ. App. 160, a judgment for $12,500 was held not to be excessive for the death of a 6 year old child whose injuries consisted of a skull fracture and other bruises, and who lived for more

than a week, during which time she suffered intense agony and pain.

In Brown v. Ellison, 1926, 12 Tenn. App. 27, a judgment for $7500 was held not to be excessive for the death of a 12 year old active boy.

In Highland Coal & Lumber Co. v. Cravens, 1928, 8 Tenn. App. 419, it was held that a verdict of $10,000 for the death of a 15 year old boy was not so excessive as to indicate passion or prejudice on the part of the jury.

In Garis v. Eberling, 1934, 18 Tenn. App. 1, 71 S. W. (2d) 215, a judgment for $10,000 for the death of a 5½ year old child who died a few hours after being injured by an automobile, was held to be excessive and was reduced to $6,500.

In Rea Construction Co. v. Lane, 1941, 25 Tenn. App. 125, 152 S. W. (2d) 1033. it was held that $7500 for the death of a 5 year old child was not excessive.

In Koehn v. Hooper, 1951, 193 Tenn. 417, 246 S. W. (2d) 68, a judgment of $15,000 for the wrongful death of an 8 year old girl was held not to be excessive under the evidence.

In Dixie Greyhound Lines v. Woodall, 6 Cir., 188 F. (2d) 535, a judgment for $20,000 was held not to be excessive "as a matter of law, taking in consideration the decedent's age of 6 years, his normal health, and life expectancy of 58.92 years, the present value of the dollar, and verdicts in similar causes heretofore, approved by rulings of the Tennessee Courts."

Under our decisions no mathematical rules of computation have ever been formulated making verdicts and judgments uniform in negligence cases. It is the duty of the courts to take into consideration the nature and

extent of the injuries, the suffering, expenses, diminution of earning capacity, inflation and high cost of living, age, expectancy of life and amount awarded in other similar cases. Town of Clinton v. Davis, 27 Tenn. App. 29, 177 S. W. (2d) 848; Foster & Creighton Co. v. Hale, 32 Tenn. App. 208, 222 S. W. (2d) 222; 15 Am. Jur. Sec. 205, pp. 621, 622.

In Town of Clinton v. Davis, supra [27 Tenn. App. 29, 177 S. W. (2d) 853], Judge Burnett, speaking for the Eastern Section of this Court, said:

" 'The complaint in the case at bar is not that the verdict was corrupt either actually or inferentially, but that it was so large as to indicate that it was influenced by passion, prejudice or caprice; in other words, not that it was a dishonest verdict, but that it was an excessive verdict.

" 'The amount of the verdict is primarily for the jury to determine, and next to the jury the most competent person to pass upon the matter is the judge who presided at the trial and heard the evidence.' [Reeves v. Catignani], 157 Tenn. [173, at] page 176, 7 S. W. (2d) [38, at] page 39."

Under the above authorities, we cannot say as a matter of law that the judgment of $20,000 is excessive. Nor have we found supporting authority that would justify restoration of the remittitur.

Accordingly, all assignments of error will be overruled, and the judgment below will be affirmed at defendant's costs.

Hale, J., concurs.

McAmis, P. J., (Eastern Section) did not participate.