Duane James PICKENS, Sr.,

v.

**SOUTHERN RAILWAY COMPANY.**

Civ. A. No. 3768.

United States District Court
E. D. Tennessee, N. D.

Sept. 18, 1959.

D. H. Rosier, Jr., D. K. Thomas, Maryville, Tenn., for plaintiff.

Key & Lee, Knoxville, Tenn., for defendant.

ROBERT L. TAYLOR, District Judge.

This is a suit by Duane James Pickens, Sr., administrator, to recover compensatory damages in the amount of $250,000 and punitive damages for the additional sum of $250,000 for the death of plaintiff's child, Duane James Pickens, Jr. Death occurred on November 18, 1958 in Maryville, Tennessee. The child was approximately 5½ years old at the time of the unfortunate accident that resulted in its death.

Plaintiff is a resident of Tennessee and the Railway Company is a non-resident corporation. Jurisdiction of this Court is invoked by reason of the diversity of citizenship of the parties.

The suit is brought for the use and benefit of the father and mother of the deceased child, who are the sole beneficiaries of any recovery that may be awarded.

Section 20–614, T.C.A. provides for the recovery of damages for a person's death caused by the fault of another. It is known as the Tennessee Wrongful Death Statute.

The following is a brief statement of the circumstances surrounding the accident:

Mr. and Mrs. Pickens, with their four minor children, the oldest of whom was the deceased, were temporarily living in the home of Mrs. Pickens' father and mother, which is located on Pflanze Street in Maryville, Tennessee. Mrs.

Finger, the grandmother, was visiting a sick relative in the West. This home is shown in the aerial photograph filed as Exhibit 1 by a circle marked with a blue pencil. The railroad turntable whereat the child was killed is also shown on this map by a red circle on which is marked the letter "X". Tazewell Pike is also shown by the letter "X" made with red pencil as well as Ft. Craig School and Goddard Street. These structures and streets were frequently referred to by the witnesses who testified in the case.

On the day of the child's death, Mr. Pickens, Sr. and Mr. Finger were in the living room. They had completed work on a flue in the house. Mrs. Pickens was in the bedroom. Deceased was with his father and grandfather in the living room. He asked and was granted permission by the father to go to the front yard and play with the other children. He left the room about 3:25 p. m. About the time he left the room, the father lit a cigarette. His mother looked out the window and observed him playing with a bicycle at the end of the porch about three minutes after he left the room. Before the father had finished smoking his cigarette, Terry Finger, uncle of the deceased and a child eight years of age, announced to the father, upon his return from school, that Duane, Jr. had been killed at the railroad turntable. This was about five minutes after the deceased had left the room. Mrs. Pickens stated that she last saw the deceased playing at the edge of the porch with his bicycle about 10 minutes before the accident.

The deceased's body was found under the turntable, which is shown in the various photographs filed as exhibits in the record, near the concrete abutment. Frank Harless, age 12, and Troy Pilkey, age 13, were playing on the turntable at the time the deceased met his death. They had been playing on this turntable and rotating it for about 45 minutes before Duane, Jr. was killed. Duane was caught between the table and the concrete abutment as the table turned. Harless got scared and ran home when he saw him caught at the concrete base. Troy

Pilkey rolled the turntable off of Duane's body and it was at that time that the body fell from the top of the concrete abutment in the hold below.

The turntable is located some 300 to 400 feet from the Finger residence. It is not easily seen from this residence, if it can be seen at all. Mrs. Pickens had never seen it prior to the accident. In order to reach it from the Finger home, Pflanze Street must be crossed. Mr. Pickens had seen the turntable on two occasions prior to the accident but had never seen any children playing on or around it. The Pickens had only lived at the Finger home on Pflanze Street about two weeks prior to the accident. Neither Mr. Pickens nor Mrs. Pickens had ever seen their children near the turntable prior to the accident. There was no fence around the Finger yard. Pflanze Street is a dead-end street and the Finger house is at the end of the dead-end street.

The turntable is about 250 yards from the Ft. Craig School. At the time of the accident and for many years prior thereto, approximately 400 students attended the Ft. Craig Grade School. About 30 of these students passed by the turntable on their way from home to attend school and on returning from school to their homes.

The turntable was 80 feet long, 16 feet wide and 7 feet high and had a load capacity of 220 tons. It was so balanced in the center as to enable small children to put it in motion and rotate it on its tracks.

It is the theory of plaintiff that the turntable was located in a residential area within three or four blocks of an elementary school and that it attracted children; that it was not fenced or guarded; that it was unlocked and easily turned by children, which presented great danger to them; that it was used constantly by children for the purpose of play; that it was hazardous and dangerous to the members of the public; that defendant knew or should have known that it was constantly used by children; and, that defendant was negligent in failing to

keep it locked at all times so as to prevent revolement on its base and track.

Plaintiff contends that the defendant breached duties owed to his deceased child under both the Attractive Nuisance and Playground Doctrines of Tennessee.

Defendant denies all charges of negligence. Defendant asserts that Mr. and Mrs. Pickens were negligent in permitting the deceased to play on the turntable and that their contributory negligence precludes a recovery. Defendant says further that it kept the turntable securely under lock and chain and that shortly before the accident some unknown persons physically broke the lock and chain and removed them and that their willful acts were the proximate cause of the accidental death of the deceased; that the negligence of the unknown persons who broke the lock and chain insulates any alleged negligence on the part of the defendant and renders its negligence, if any, remote and not the proximate cause of the accident.

The issues, as set forth in the pretrial order, are:

(1) Was the defendant guilty of negligence that proximately caused the death?

(2) Were Mr. and Mrs. Pickens guilty of contributory negligence that precludes recovery?

(3) Was the lock and chain on the turntable that prevented its revolement broken and carried away by some unknown party, and if so, did this break the chain of causation so as to make any negligence upon the part of the Railway Company remote and thus relieve it from liability. And,

(4) If plaintiff is entitled to recover, what is the amount of the damages?

These issues will be considered seriatim.

The first issue involves a question of fact, but, before analyzing the facts, certain applicable legal principles should be considered, the first of which relates to the Doctrine of Attractive Nuisance which has long been recognized in Tennessee. One of the first cases in Tennessee that discussed this Doctrine was that of Whirley v. Whiteman, 38 Tenn. 610. The Court held that the owners of a paper-mill who left the gears exposed unguarded and unlocked were liable for the death of a three year old boy who was attracted to the mill and while there playing was killed. The proof showed that children played around the mill almost every day.

In Railroad Co. v. Cargille, 105 Tenn. 628, 59 S.W. 141, the Court restates and adopts the rule in the original "turntable" case. In that case, 105 Tenn. at page 632, 59 S.W. at page 142, the Court states:

"The general rule adopted by the supreme court of the United States and the courts of most of the states of the Union is that if a railroad company leaves a turntable or other like machinery upon its own property, or under its control, likely to attract children, so unsecured that children may put it in motion, the company is negligent, and if a child is injured thereby will be liable in damages. Stout v. [Sioux City & P.] Railroad Co., 17 Wall. 657, 21 L.Ed. 745; 27 Am. & Eng. Enc. Law, 344, and cases there cited."

In Williams v. Town of Morristown, 32 Tenn.App. 274, 222 S.W.2d 607, at pages 612 and 613, the Court says:

"Whether a condition creates an attractive nuisance is a question of law for the court. Louisville & N. Railroad Company v. Ray, 124 Tenn. 16, 134 S.W. 858, Ann.Cas.1912D, 910.

"At the conclusion of an elaborate annotation consisting of 260 pages devoted to the subject 'Attractive Nuisances' in the case of United Zinc & Chemical Company v. Britt, 258 U.S. 268, 42 S.Ct. 299, 66 L.Ed. 615, 36 A.L.R. 28. At page 294 of 36 A.L.R. the annotator stated the essentials of a case based upon the doctrine of attractive nuisance:

" 'To make out a case against the person responsible for the danger, there must appear:

" 'First. That the injured child was too young to understand and avoid the danger.

" 'Second. That there was reason to anticipate the presence of such children, either because of some attraction on the premises, or because the danger was in some place where children had a right to be.

" 'Third. That there was a strong likelihood of accident.

" 'Fourth. That the danger was one other than those ordinarily encountered.

" 'Fifth. That the precautions not taken were much as a reasonably prudent person would have taken under the circumstances.'

"We think each of these requirements is met in the case at bar."

The Tennessee Court of Appeals discussed the Playground Doctrine in the case of Gatlinburg Construction Company v. McKinney, 37 Tenn.App. 343, 263 S.W.2d 765, at pages 767 and 768:

"It is unnecessary to decide whether, under the facts, the attractive nuisance doctrine can properly be applied. The playground theory, enunciated in Williams v. Town of Morristown, 32 Tenn.App. 274, 222 S.W.2d 607, is clearly applicable. The basis of such liability, as there defined, 32 Tenn.App. at page 287, 222 S.W.2d 607, is that if an owner of land knows that children of tender years habitually play upon his land to the extent that it becomes known as a playground for children, he is bound to exercise ordinary care to see that his premises are reasonably safe for the purpose and is duty bound not to permit them to be exposed to a known danger. See also 65 C.J.S. Negligence § 40, p. 505; Ann.[otation] 8 A.L.R.(2d) 1285; Restatement of Torts, Section 339.

"Refinements of the rule set forth in these authorities limit its application to situations where the landowner knows or, by the exercise of reasonable care, should know that children of immature years are habitually trespassing upon his land to use it as a playground, under conditions other than natural, which the landowner knows or should know involve an unreasonable risk of bodily injury and which children because of their youth will fail to discover and appreciate. To bring property within the rule its use as a playground must be generally known in the immediate vicinity and not be merely occasional or intermittent.

"We think factors to be considered in determining liability under the rule include the slight value and utility to be derived by the owner in maintaining the condition or the small cost of removing the danger, as compared to the likelihood and seriousness of injury to young children, and the presence or absence of guards, fences and warnings.

"In the present case it is clear that defendant knew or had good reason to know that children were making a playground of its lot. * * * *"

In the case of Birdsong v. City of Chattanooga, Tenn., 319 S.W.2d 233, at page 236, the Court stated that in order for the proof to support the playground theory it must be shown that the owner of the land had actual knowledge that children were using the property for a playground. Under the Attractive Nuisance Doctrine the property owner is chargeable with knowledge if in the exercise of ordinary care he should have known that children were using the instrumentality as a plaything. Under either doctrine the landowner only owes the duty of ordinary care to keep his premises reasonably safe for the playful children.

The immediate question for consideration is whether the defendant exercised ordinary care to make its premises on which the turntable was located reasonably safe for the deceased and other members of the public.

The record shows beyond question that the turntable was used by children for play at the time of the accident and for many years prior thereto. These children would revolve the turntable in the course of their play as they were doing at the time deceased met his death. The time it was most used by the children was during summer vacations and during the winter school months before and after school and on Saturdays and Sundays. The trainmen of the defendant while using the turntable had seen children playing on and around it on various occasions. The trainmen in operating their trains on the railroad track near the turntable frequently observed children playing on the turntable and rotating it.

This turntable is at the rear of the McMurray home which is located on Sevierville Road. Mrs. McMurray stated that sometime before the accident she observed children revolving the table and that she called Southern Railway Depot in Maryville and notified its employees. This occurred about the time the Southern discontinued the use of the table. The table was removed around the 20th of December, 1958, a month following the accident. Mrs. McMurray in pre-trial examination stated that she called the County Police when she saw the children rotating the table. She stated that the Court Reporter must have made a mistake in writing County Police rather than Southern Depot. The Court is inclined to believe that the Court Reporter was correct in her testimony that Mrs. McMurray in giving her statement to the Railroad representative stated that she called the County Police. Mrs. McMurray may have intended to use the words Southern Depot at the time she gave the statement. She impressed the Court as a witness who would not intentionally make an erroneous statement.

Mr. Bluford, Chief of Police at Maryville, examined the turntable immediately after the accident and made a check for the lock and chain but found none. He wired the table immediately after the accident to keep it from revolving. When he later returned he observed a lock and chain at the place where he had wired it. The locking devices shown on Exhibit 4 indicated that a lock and chain had not been on the table for a considerable length of time.

Mrs. Russell, whose home is shown in Exhibit 4 and who lives within sight of the table, observed children in the area and around the turntable on many occasions prior to the accident but never saw them on the turntable.

John Dunlap, whose home is on Pflanze Street and between the Finger home and the turntable—shown on Exhibit 11—passed the turntable almost every day on his way to work for the Aluminum Company. He also passed it as he returned from work from the Aluminum Company to his home. He passed so close that he could touch it with his hands as he passed. He has worked for the Aluminum Company many years. He observed children on Sundays, weekends, and Saturdays playing on the turntable prior to the accident. There had not been a lock and chain on the turntable for about a year before the accident occurred.

Don Dunlap, son of John, attended the Ft. Craig School and passed by the turntable each day on his way to school. He observed children playing on the turntable regularly. He has seen as many as eight at a time on the table. They would rotate and ride it. He had not seen a lock and chain on it for about a year prior to the accident.

Argolis Hyatt also attended Ft. Craig School. He played on the turntable from the time he was nine years old and he was 19 at the time he gave his testimony. He observed children playing on the turntable regularly. It was a gathering place for boys. The girls had a little house built under the table at the end opposite the concrete abutment. He observed the turntable set crossways of the hole prior to the accident.

Freddie Rhodes also attended Ft. Craig School. He observed children playing on the turntable regularly up

until the day of the accident. He had not seen a lock on it for about a year prior to the accident. The turntable was crosswise over the hole at least three weeks before the accident. He has ridden on the table many times while trainmen were turning steam engines on the tracks on which the table turned.

Joyce Hatcher lives below the Finger home. There is one vacant lot between the two houses. She stated that she observed the deceased on the turntable about two days before the accident. She passed by the table on her way from home to the store. She passed by it on the day before the accident. It was not locked at that time. She visited the store on an average of every two or three days. She stated that she saw the table locked about two weeks before the accident; that there was an old lock on it and a new lock had been on it a few days before the accident; that she only saw the table unlocked on two occasions; that she observed children playing on the table at various times; that the old lock was beaten off; that a new lock was on the table up to the day the boy was killed; and, that the new lock was wired.

The Chief of Police wired the table immediately after the accident. He did this before the new lock was installed. If the Chief of Police is correct in his testimony then Miss Joyce Hatcher is mistaken in her statement that the new lock was installed prior to the accident.

Lola Mae Hatcher, mother of Joyce, also passed by the turntable in going from her home to the town of Maryville. She last saw a lock on the table, which was a new lock, about three weeks before the boy was killed. The lock had been beaten off of the device to which it was attached but had been put back on before the accident. She had seen the lock beaten off on two occasions. She stated that she saw the lock and chain in place on Thursday before the boy was killed. She frequently observed boys riding on the turntable before the accident. A little bunch of boys played regularly on the table. She doesn't remember seeing any lock and chain on the table after the child was killed.

It seems out of the ordinary that she remembered seeing the lock and chain in place on Thursday preceding the accident but does not remember seeing the lock and chain in place again after the accident although she passed by the table every two or three days. All of the witnesses who testified on the subject stated that the new lock was placed on the table the day following the accident and remained in place until the table was finally removed on December 20, 1958.

Witness Robinson was employed by the defendant as Assistant Track Supervisor on July 1, 1954, which position he held at the time of the accident. He patrolled the railroad tracks, and the turntable tracks were within his jurisdiction. He was off from work from June 28 to October 30, 1958. His records showed that he was in Maryville on November 6, 10 and 12, 1958 and that he inspected the turntable on each of these occasions and that on each occasion he found the lock and chain in place on the turntable. The lock and chain were gone the latter part of May or the first of June, 1958 and he replaced them. He worked in Maryville from the latter part of 1955 or the first of 1956 until May or June, 1958 and inspected the turntable regularly during that period and never found the lock and chain on the turntable out of place.

There has not been a claim for damages for injury on the turntable filed with the Claim Department of the defendant since April 1, 1948.

Mr. Robinson's statement that he never found the lock and chain out of place from 1955 through the last of May or the first of June, 1958 is contrary to the great preponderance of the evidence in this record. This fact weakens his testimony that he found the lock and chain in place on November 6, 10 and 12, 1958. The preponderance of the testimony indicates strongly that the lock and chain were not in place on these dates.

■ The preponderance of the evidence shows, and the Court finds, that the defendant did not exercise ordinary care to keep the turntable reasonably safe for the deceased and other members of the public; that it permitted the table to go unguarded without a lock and chain for at least a period of around one year; that the table could be easily revolved or rotated by small children; that the rotating of the table by children created a dangerous situation; that defendant knew that children rotated the table and used it as a place to play; that the table was unlocked on the day of the child's fatal injury and that defendant was negligent in not having the table securely locked or guarded and that as a direct and proximate result of such negligence plaintiff's intestate lost his life.

■ This brings us to the question of whether Mr. and Mrs. Pickens were guilty of contributory negligence under the Tennessee law. If either Mr. or Mrs. Pickens were guilty of contributory negligence proximately causing or contributing to the accidental death, plaintiff could not recover. The negligence of one parent in a case of this character is imputable to the other under the Tennessee rulings, as they are sole beneficiaries of the cause of action. Shelton v. Williams, Tenn., 321 S.W.2d 807. Bamberger v. Citizens' Street Railway Company, 95 Tenn. 18, 31 S.W. 163, 28 L.R.A. 486. Nichols v. Nashville Housing Authority, 187 Tenn. 683, 216 S.W.2d 694. Anderson v. Memphis Street Railway Company, 143 Tenn. 216, 227 S.W. 39.

During the trial it was not seriously contended that Mrs. Pickens was guilty of any negligence, but it was argued that Mr. Pickens was negligent because he allowed the child to go out in the yard and play with his other children while he remained in the room to smoke a cigarette. The mother looked out the window at all the children within a short time after the deceased left the room and went into the yard. It was at that time she observed him playing with a bicycle at the end of the porch. According to the testimony, the parents received word of his death within from two to five minutes after the mother observed him playing in the yard.

■■ The law does not require parents to keep a constant watch over their children in order to avoid injury to them. The law requires that they exercise ordinary care in looking after their children to keep them away from places of peril. As previously stated, the mother did not know of the turntable and although the father had seen it on a couple of occasions he did not know that is was unguarded or unlocked. Nor did he know that children played on it or around it. He had never seen any of his children near it.

The Court finds as a fact that neither Mr. nor Mrs. Pickens was guilty of contributory negligence.

What has been said in the discussion of Issue No. 2 is dispositive of Issue No. 3. Issue No. 3 raises the question as to whether some unknown party broke the lock and chain on the turntable and whether this intervening act broke the chain of causation so as to make the negligence of the defendant the remote cause rather than the proximate cause of the accident.

The Court concludes that the negligence of the defendant in the manner hereinbefore pointed out was the proximate cause of the accident.

This brings us to the final issue in the suit which is the amount of damages to which plaintiff is entitled. We are dealing with the death of a 5½ year old boy. The mother and father quite naturally considered him a child with more than ordinary ability. It was stipulated that the death was instantaneous. The funeral expenses amounted to $590.32. In addition to the funeral expenses, the plaintiff, as Administrator, is entitled to damages for the pecuniary value of the life of the deceased that was destroyed, irrespective of who would have benefited by the life had it not been lost. Davidson Benedict Company v. Severson, 109 Tenn. 572, at pages 614 and 615, 72 S.W. 967, at page 977.

■ Of course, the pecuniary value of the child's life cannot be measured mathematically The Court, in a case of this kind, must look to the life expectancy of the child and the amount awarded in similar cases as well as to inflationary values.

The Court of Appeals of Tennessee decided a case on August 24, 1955 involving the death of an eight year old boy. This case is cited as Management Services, Inc. v. Hellman, 40 Tenn.App. 127, 289 S.W.2d 711. In that case the jury rendered a verdict for $35,000 and the Trial Judge granted a remittur of $15,-000. Both parties appealed. The child died as a result of a fatal injury when he struck a rope stretched across the apron of a swimming pool and was knocked to the pavement. He lived about three hours after the injury. The Court of Appeals affirmed the action of the Trial Judge granting the remittur and permitted to stand the verdict of $20,000. In holding that the award of $20,000 was reasonable, the Court reviewed a number of Tennessee cases involving the death of children of tender years. This review begins on pages 151 (Tenn.App.) and 721 (S.W.2d).

The first case is that of Southern Queen Manufacturing Company v. Morris, 1900, 105 Tenn. 654, 58 S.W. 651 the verdict of $7,500 for the wrongful death of a 17 year old boy was held not to be excessive.

In Cheek v. Fox, 1917, 7 Tenn.Civ.App. 160, a judgment for $12,500 for the death of a six year old child was affirmed.

In Brown v. Ellison, 1926, 12 Tenn. App. 27, a judgment of $7,500 for the death of a 12 year old boy was affirmed.

In Highland Coal & Lumber Company v. Cravens, 1928, 8 Tenn.App. 419, a judgment for $10,000 for the death of a 5½ year old boy was reduced to $6,500.

In Rea Construction Company v. Lane, 1941, 25 Tenn.App. 125, 152 S.W.2d 1033, a verdict of $7,500 for the death of a five year old child was upheld.

In Koehn v. Hooper, 1951, 193 Tenn. 417, 246 S.W.2d 68, an award of $15,000 for the death of an 18 year old girl was affirmed.

In Dixie Greyhound Lines v. Woodall, 6 Cir., 1951, 188 F.2d 535, a verdict of $20,000 for the death of a six year old boy was held not to be excessive.

In Bradshaw v. Holt, 1956, 200 Tenn. 249, 292 S.W.2d 30, the verdict of $5,000 for the wrongful death of a colored boy that occurred in Haywood County was held not to be excessive.[1]

■ Considering the life expectancy of plaintiff's deceased, his good health and at least average mind and the amounts which have been awarded in other cases in Tennessee involving children of tender age, the Court is of the opinion that the plaintiff is entitled to recover the sum of $14,000.

In summary, the Court holds:

(a) That defendant was guilty of negligence that proximately caused the accident and resulting death of plaintiff's intestate.

(b) That neither Mr. Pickens nor Mrs. Pickens was guilty of contributory negligence.

(c) That the chain of causation in defendant's negligence was not broken by the negligence of some unknown third party so as to make the negligence of the defendant the remote cause of the accident and the negligence of the third party the proximate cause of the accident. And,

(d) That plaintiff is entitled to recover against the defendant the sum of $14,000.

Present order.

---

1. The Court has borrowed freely from the language used by the Court of Appeals in

Management Services, Inc. v. Hellman, supra, without using quotation marks.