RIVERSIDE MILL CO. *et al. v.* PARSONS *et al.*

(*Nashville,* December Term, 1939.)

Opinion filed June 29, 1940.

BEN KINGREE, JR., of Shelbyville, and ROBERTS & ROBERTS of Nashville, for plaintiffs.

EDWIN T. NANCE, of Shelbyville, for defendants.

MR. JUSTICE CHAMBLISS delivered the opinion of the Court.

Riverside Mill Company and Fayetteville Milling Company appeal from an award of compensation for the death of H. A. Parsons made to his widow, Mrs. Parsons, and two minor children. Both appellants deny that there is material evidence to sustain the finding of trial

judge that Parsons' death resulted from an injury accidentally received in the course of his employment, and both complain of the admission of certain testimony. Fayetteville Milling Company denies that Parsons was at the time of his alleged injury working for it, or on its premises, and also relies on the failure of Mrs. Parsons to give notice to it within thirty days.

Appellants both operated mills for manufacturing corn meal and wheat flour, one plant being located in Shelbyville and the other in Fayetteville. While separate corporate entities the officers and stockholders were much the same and there was some interchange of employee services. E. C. Huffman was president of both. The deceased was a miller by occupation, fifty-three years of age, described as muscular and active, a steady and constant worker, apparently in good health. There is evidence and the trial court found that his death resulted from a fall while at work in the Riverside Mill about 3 P. M., on the 8th of June, 1939. The appellants contend that there is no evidence that Parsons suffered a fall on this occasion, other than the testimony of witnesses that he so stated, admitted by the trial judge over objection. And, further, that if he did have a fall, his death is not proven to have been the result thereof; that an autopsy revealed a diseased condition of the heart and blood vessels, a ruptured aneurysm of the aorta; and that if it be conceded that he had a fall, it is a matter of conjecture only whether the fall preceded and induced the rupture, or whether the fall followed and was induced by the rupture, or other internal heart and arterial disturbance. Medical testimony was to the effect that the condition of his heart and arteries was such that death might have come to him either with or without a fall, or other traumatic cause.

In this situation it becomes necessary to consider the particulars surrounding the happening at some length.

The record does not disclose any previous illness of this kind or treatment therefor. He had made no complaint during this day and had pursued his work as usual. We copy from the brief of counsel for petitioners this fairly accurate description:

"On the third floor of the defendant, Riverside Mill Company's mill there was located, what is known as a double meal reel with legs to it. From the top of the first reel to the floor is about five feet, and on top of this first reel is another reel about four and one-half feet high. The two reels are connected together by belts or pulleys and there is a spout through which corn is fed into the top of the reel. (Tr. 109 and 110). The top reel is smaller than the bottom reel and there is a narrow ledge for a person to stand upon about twelve or fourteen inches. On this ledge there are some blocks which stick up about an inch where one is standing on. (Tr. 11) Meal and flour settling on the floor steps and other places make such places slick. The floor, steps and other places were slick. (Tr. 120) The ledge around the top of the first reel was slick (Tr. 121). The employees wore rubber soled shoes as they didn't slide as bad as leather soled shoes, but with rubber soled shoes an employee would sometimes slip. (Tr. 122)

"During the morning there were a number of sacks cut off (taken from large stacks of sacked wheat) and cut open. The deceased, who was the miller, examined the wheat preparatory to grinding it. (Tr. 125)

"In the afternoon about three o'clock the reel became stopped up and the deceased and the witness Leftwich went upstairs to the third floor to unstop the meal reel. The witness Leftwich procured a step ladder and set it

near the ledge and the deceased climbed up on it and got out on the ledge while the witness stood on the floor. (Tr. 127) The deceased was turning the top reel and the witness Leftwich was turning the bottom reel. They were engaged for about five minutes unstopping the reel, during which time the deceased did not make any complaints about anything being wrong with him. The deceased continued on doing what he started to do. The witness Leftwich and the deceased were on the third floor of the Mill about ten or fifteen minutes (Tr. 128), when the witness Leftwich left to go downstairs and left the deceased standing on the ledge holding to the top of the reel with one hand and holding the meal back in the spout with the other hand by letting it run through his fingers. (Tr. 129-112)

"The witness Leftwich went downstairs to the engine room and was returning from the engine room when he noticed the deceased, who had just come from upstairs down to the bottom floor.

" 'Q. Show the Court where his hands were, and in what position he was, when you saw him? A. Well, he was limping and holding left hip with his left hand and his left chest, side, with his right hand.

"The Court: Limping and holding his left hip with his left hand, and what about his right hand? A. His right hand on his left chest and side, like this.

" 'Q. Did he continue to stand in that position, or what did he do? A. No, sir, he went and sat down on some sacks just as quick as he could get to them.

" 'Q. Now what was his color and etc.? A. Very pale.' " (Tr. 114)

"It had been ten or fifteen minutes from the time the witness Leftwich had left the deceased on the ledge until he saw him on the bottom floor. (Tr. 330)

" 'Q. As you approached Mr. Parsons, who spoke first? A. Mr. Parsons spoke first.

" 'Q. What did he say? A. He said, "George, go ahead and do the best you can; I fell off that reel upstairs and hurt myself."

" 'Q. Now at that time describe where Mr. Parsons' hands were if you noticed? A. His right hand was on his left breast, and his left hand was on his left hip.

" 'Q. Now, was that before you heard the conversation between Mr. Parsons and Mr. Huffman, or after you had heard the conversation? A. It was before.' " (Tr. 334)

Direct Examination of Robert Gamble:

" 'Q. What was he doing on these sacks and was he without pain or with pain? A. With pain.

" 'Q. What was the position his body was lying? A. Well, he was sitting up with his hand on his hip, back here; I won't say whether it was his right hand or left one; I won't say which one it was.

" 'Q. Well, on these sacks, was he lying perfectly still, or was he rolling or tumbling? A. Well, he was laying down on these sacks and he had taken his hands and kind of crawled until he got to the end of them, and he would take his arms and pull back up after he crawled the length of them. He was suffering terribly.

" 'Q. You saw him there that morning? A. Yes, sir.

" 'Q. Talked to him? A. Yes, sir.

" 'Q. Did you notice anything out of the ordinary the matter with him? A. No, sir.

" 'Q. Did he do his usual work there that he always did? A. Yes, sir.' "

Mr. Huffman, President of the Mills, came up at this time and observed the condition of Parsons and asked

him what was the matter, to which he replied that, "he had fallen off the reel upstairs and hurt his hip." He was rubbing his hip, was drenched with perspiration, his facial expression indicated great pain and he was unable to use his leg. Mr. Huffman called Dr. Avery, who administered a hypodermic. Mr. Parsons was later moved to his home, where he died the next morning.

██ We think the statement made by the deceased to Leftwich was properly admitted as a part of the *res gestae*. It will be observed that it was wholly voluntary and made to an associate under circumstances which called for an explanation of his abandonment of his part in the work they were jointly engaged in. There is no proof of the exact time that had elapsed, but the fair inference is that the lapsed time was brief, that Parsons was seeking relief immediately following the injury from which he was quite apparently suffering intensely. The circumstances preclude premeditation, or design, and, on the other hand, meet the "ultimate test" of spontaneity. *Garrison* v. *State,* 163 Tenn., 108, 40 S. W. (2d), 1009. In the recent case of *National Life & Acc. Ins. Co.* v. *Follett,* 168 Tenn., 647, 80 S. W. (2d), 92, 99, Chief Justice GREEN reviews our cases and cites many from other States dealing with the *res gestae* rule. Much that he says therein is directly applicable here, indeed, controlling, since the facts are quite similar in their determinative features. He distinguishes *Baxter* v. *Jordan,* 158 Tenn., 471, 14 S. W. (2d), 717, relied on here by appellants. He also approves the holding in *Kennedy* v. *Southern Railway Co.,* 2 Tenn. Civ. App. (2 Higgins), 103, applicable here, that, "the trial judge possesses a large discretion in ruling on the competency of evidence offered as part of the *res gestae.*"

With this testimony in, the evidence is that the de-

ceased had an accidental fall from which he had suffered painful injuries. It may be added that this testimony as to his statement finds support in many circumstances indicating that the deceased had suffered a fall, but we think it unnecessary to pursue the point further.

We think, also, that there is material evidence to sustain the trial judge's finding that the fall brought on the condition which was the immediate cause of death. Four or five doctors testify, several of them having been present at the autopsy held the day of the death. All agree that the deceased had diseased and impaired blood vessels and died from rupture, as before stated. None could say positively what part the fall, if there had been a fall, played in the result, but we understand none to deny that such a fall might have induced the fatal result. As we read the testimony as a whole, it is consistent with a finding that the death of the deceased was, at least, accelerated by his fall. And this is the common sense of it. A man has a diseased condition of his internal organs, such as heart and blood vessels; he goes about his daily physical tasks without interruption, apparently undisturbed thereby; one day he has a violent fall and suffers great pain therefrom in his body and limbs; he soon thereafter dies from rupture of these impaired blood vessels. The deduction is forced upon us that the shock of his fall was responsible for the collapse of his impaired organs, at least hastened, accelerated, the fatal result. A recent case illustrative of this doctrine of acceleration is *Mayor and Aldermen* v. *Ward*, 173 Tenn., 91, 114 S. W. (2d), 804. Also, see *Sanders* v. *Blue Ridge Glass Corporation*, 161 Tenn., 535, 33 S. W. (2d), 84, 85, wherein this Court sustained an award where the proof indicated that an injury "aggravated the already abnormal condition of petitioner's heart," and death resulted. See, also, much in point,

the recent case of *Sears-Roebuck & Co.* v. *Finney*, 169
Tenn., 547, 89 S. W. (2d), 749.

As shown, the deceased was working when injured in
the Riverside Mill. Appellant Fayetteville Milling Company says that (1) it received no written notice within
thirty days of the accident, as required by statute, and
that (2) deceased was not working for it at the time.

■ ■ As to the notice, in the first place, Mr. E. C.
Huffman was President of both mills and it was he who
came upon the scene immediately after the deceased had
been injured, and ordered a doctor and did what else the
situation demanded. He saw for himself the situation
and was directly advised by the deceased himself. The
Riverside Mill Company apparently concedes that this
was as to it a waiver of the requirement of notice, as it is
under our holdings. We see no reason why this is not
true of the Fayetteville Milling Company, as well, since
Mr. Huffman was president of that company, also, that is,
if the deceased was at the time an employee of both.
Moreover, it appears that the widow-petitioner was advised by the state department in charge of compensation
not to employ a lawyer, the impression being conveyed
that no legal steps would be necessary. We think this
presented a situation which would probably justify the
trial judge in excusing the giving of the notice within the
thirty days (it was thereafter given) in the exercise of
his broad discretion.

■ While the exact nature of the joint employment is
not fully disclosed on the record, it appears clearly that
the weekly wages or salary of Parsons was being paid
by these two Companies, $10 a week by each, and this had
been so for a long period. We think this justifies the
holding by the trial judge, pursuant to the provisions of
Code, section 6882, that the two employers should con-

tribute to the award in equal proportions. This Code Section reads: "In case any employee for whose injury or death compensation is payable under this chapter shall at the time of injury be employed and paid jointly by two or more employers subject to this chapter, such employers shall contribute to payment of such compensation in a proportion of their several wage liability to such employee. If one or more, but not all, of such employers should be subject to this chapter and otherwise subject to liability for compensation hereunder, then the liability of such of them as are so subject shall be to pay the proportion of the entire compensation which their portion of the wage liability bears to the wages of the employee."

In view of this explicit statutory provision, it becomes immaterial for which, or where, the deceased was working at the time of the accident.

On the whole case we find no error. Affirmed.