# WHITE STAR LINES, Inc. v. WILLIAMS.—222 S. W. (2d) 209.

Eastern Section.    February 26, 1949.

Petition for Certiorari denied by Supreme Court, April 30, 1949.

178

Goddard & Gamble, of Maryville, and Clyde W. Key, of Knoxville, for plaintiff in error.

Hodges & Doughty and Roy N. Stansberry, all of Knoxville, for defendant in error.

HOWARD, J. This is an action for damages for personal injuries sustained by plaintiff Charles Williams, age 16, when he fell over a rock wall immediately prior to his intention of entering one of defendant's buses while the bus was parked unattended on the north side of Harper Street in the City of Maryville.

Plaintiff's declaration alleges specific grounds of negligence, as follows:

(a) In maintaining a terminal for passengers alongside a deep abyss or pit.

(b) In failing, refusing and neglecting to provide or maintain guards or rails along the edge of the sidewalk utilized as a terminal.

(c) In failing, refusing and neglecting to provide lighting at the place utilized as a terminal.

(d) In failing, refusing and neglecting to have its buses under the care and control of an agent at the time plaintiff was invited to board the same.

(e) In requiring members of the public to board its bus at a place where the sidewalk was completely blocked by an open door of its vehicle.

(f) In failing, refusing and neglecting to advise plaintiff of the dangerous condition existing.

At the conclusion of plaintiff's evidence and at the conclusion of all the evidence, defendant moved for a directed verdict, which the court overruled and, after deliberation, the jury returned a verdict in favor of plaintiff for $5,000 which the trial judge approved. Thereupon, defendant filed motion for a new trial, which was denied, and defendant has appealed to this Court, assigning errors.

The record discloses that defendant, White Star Lines, Inc., was on the date plaintiff was injured engaged in the business of transporting passengers for hire with its principal office in Maryville, Tennessee. It held various

franchises from the State Railroad and Public Utilities Commission as a common carrier of passengers between certain cities, including Maryville and Knoxville. In addition to its inter-city operations, the defendant also conducted a street bus service in and around the City of Maryville under a franchise granted to it by the City authorities of Maryville. The defendant, in consideration of the City of Maryville granting to it a franchise including the use of terminal facilities located at the northwest corner of the intersection of Court and Harper Streets, contracted to pay the City of Maryville a percentage of its gross receipts.

Subsequent to the granting of the aforesaid franchise, the Maryville authorities on July 17, 1946, authorized the defendant to stop and park its city buses on the north side of Harper Street 60 or 70 feet east of its bus terminal. This space allotted approximated 60 feet in length running eastwardly from the intersection of Harper and Court Streets to a point approximately 10 feet west of a telephone pole, and was sufficient in which to park two buses with 10 feet over to enable the buses to pull in and out without difficulty.

Harper Street runs generally east and west and is paralleled on the north by a sidewalk. North of the sidewalk and paralleling it is a wall 18 inches or more in height and about 28 inches wide, and without guard rail. This street going in a westwardly direction is on an incline and in order to take care of the incline, instead of making the wall itself on an incline, it was originally constructed so that the top of the wall was in the nature of steps several feet apart. North of the wall the ground was approximately 20 feet lower than the top of the wall, thus creating a precipitous drop from the top of the wall of approximately 20 feet. This part of the terrain which

is lower than the sidewalk was on the night of the accident used by defendant for parking buses.

In that portion of Harper Street allotted by the authorities of the City of Maryville, the defendant erected or caused to be erected signs, as follows: "Bus Stop—White Star Lines", or "No Parking—Bus Stop—White Star Lines".

Usually the buses operated by defendant on the City runs were small buses, commonly known as city-type buses. Defendant had only two of these smaller buses and when either or both of them were off for repairs or servicing, the defendant used the same type of bus used on runs between Maryville and Knoxville, which is a larger bus with a door that opens out, rather than fold like an accordion, such as was on the smaller buses.

On the night in question, there is no dispute but what one of the larger buses was being used by the defendant, and by stipulation the parties agreed that the width of the door on said bus was 34½ inches wide.

On December 30, 1946, the plaintiff, accompanied by his friend, Ray Harrell, age 15, rode defendant's bus from plaintiff's home on Everett High Road, to the business section of Maryville (a distance of about one mile), where they attended an evening show. After the show the two boys went to defendant's bus where it was parked unattended on Harper Street in the space heretofore described. There they intended to take the bus for the purpose of returning to their homes. Upon reaching the bus the plaintiff and his companion saw inside the bus two young girls, Joan Crisp and Norma Russell, whom they recognized apparently by the street lights since the bus lights were not on. These girls lived near plaintiff's home and had preceded plaintiff and his companion from the show and had entered the bus and closed the door

because the weather was cold and disagreeable. Plaintiff stopped near the bus door and from where he was standing on the sidewalk he called to the girls to open the door so that he and his companion could enter the bus. In response to his request, one of the girls, Joan Crisp, attempted to open the bus door by taking hold of the door handle near the driver's seat. Whether the bus door was ever opened by the Crisp girl is in dispute. Both girls testified that they did not believe the door was ever opened; that it may have been partially opened, but that it was never opened all the way. Plaintiff testified that he stepped back after requesting that the door be opened to avoid being struck by it as it opened; that as he stepped back his shoe heel struck the 18 inch wall immediately behind him causing him to fall over the wall to the ground below, a distance of 20 feet from which fall he sustained serious personal injuries. It is admitted that no part of the door actually struck plaintiff.

Since the street was subsequently improved, the testimony of witnesses varied as to the width of the sidewalk at the time of the accident. Plaintiff's witness, Lloyd Harrell, testified that he went to the scene of the accident shortly after it occurred and that the sidewalk itself was 36 inches wide, but he was unable to say for sure about the presence of, or width of, the grass plot between the curb and the sidewalk. All the witnesses testified that the sidewalk after the street was graded was not as wide as it previously was.

The procedure in loading buses, both on city runs and on inter-city runs, was that the driver would notify the dispatcher at the terminal, where there was a heated room for passengers, that it was time for his run and the dispatcher would announce over the loudspeaker system that a certain bus was ready for loading. Then the driver,

if he were the driver of a city bus, would proceed to where the bus was parked and load the bus and take up the fares or tokens.

It is admitted that the bus on which plaintiff intended to become a passenger did not leave the terminal for the Everett High Road run until 10:20; that at 10:00 o'clock the bus went into service and left for a short run which it completed before leaving at 10:20. Plaintiff and his companion, as well as the two girls, each testified that they intended to ride the bus on the short run before it left for their homes, as was customary for young people to do.

With reference to the franchise granted defendant by the authorities of the City of Maryville, J. N. Badgett, City Recorder, testified that the defendant did not pay any additional consideration for the privilege of parking its buses on Harper Street, and that no consideration was paid at all for this privilege; that the City did not surrender control of any part of its streets, nor was defendant given the right to change the physical situation at the parking place.

It is insisted on behalf of the defendant, as follows: (1) no material evidence to support the finding of the jury that plaintiff was a passenger on defendant's bus when he sustained his injuries; (2) no material evidence to support the finding of the jury that the defendant was negligent; and (3) no evidence that the defendant exercised any control over the street where the bus was parked. We think in the light of the recent decision of our Supreme Court in the case of City Transportation Company v. Noel, 216 S. W. (2d) 691, 692, and other authorities hereinafter referred to that defendant's insistence has merit. The evidence before us is undisputed that plaintiff was not on the bus or upon defendant's property

at the time he sustained the injuries complained about, and that the defect or dangerous condition of the wall and precipice adjoining the sidewalk was not constructed by the defendant, nor was it under defendant's control, and that the condition complained about was constructed by the City of Maryville before the defendant company secured the privilege of parking its buses there.

In general, it is the duty of the carrier to provide and maintain a convenient and reasonably safe place at which its vehicles can stop for passengers to get on board or alight. However, carriers operating buses on the public streets are not subject to this duty, since they neither own nor control the streets.

The law applicable here is stated in 13 C. J. S., Carriers, Sec. 723, page 1355, as follows: "Where the conditions under which particular classes of carriers must operate their vehicles require that passengers boarding or alighting therefrom be picked up from, or discharged on, the traveled portions of public streets or highways outside the control of such carriers, they are not usually liable for injuries sustained by such passengers by reason of dangerous conditions existing in such areas; nor in such cases is the carrier ordinarily required to exercise the high degree of care which is required of carriers who control the place of boarding or alighting, it being usually sufficient that the carrier use reasonable care to see that the place selected for picking up or discharging passengers is safe for that purpose, and that while the vehicle is stopped the carrier exercise ordinary care or care in proportion to the danger likely to be encountered by the passenger in the particular situation."

As stated in 10 Am. Jur., Carriers, Sec. 1407: "The status of a person approaching a street car for the purpose of boarding it is not considered that of a passenger.

As has been aptly pointed out, such a person is not yet upon the property or premises of the carrier and is in no sense subject to the control or direction of the carrier. He may advance or recede. Hence, there is no duty upon the part of the carrier to see that such person is not injured by other vehicles in the highway.'' For numerous cases supporting the above rule, see 75 A. L. R., 285, et seq. In City Transportation Co. v. Noel, the plaintiff, Lois Noel, recovered a judgment in the Circuit Court for personal injuries sustained when she fell on snow and ice near a standing bus engaged in taking on passengers on Broad Street in the City of Kingsport. In reversing the judgment of the Circuit Court, which had been affirmed by the Court of Appeals, our Supreme Court said:

''The great weight of authority is to the effect that when an intending passenger is on what might be termed station grounds or railroad yards his status is that of a passenger. Does this rule apply to one intending to enter a motor bus on the public street?

''In the case of the intended passenger entering the station, etc., the carrier has complete control of its roadbeds, stations, platforms, and yards. It has the selection, control, management and operation of the whole instrumentalities of carriage and at least a limited control over and direction of the passenger. The exact contrary is true of motor-buses; they operate upon city streets over which they exercise no control; they, in the very nature of operation, maintain no depots, stations, platforms, or grounds for the reception and discharge of passengers. Of necessity they accept their passengers from and discharge them on the sidewalks and street corners over which they have no control.

"Manifestly it would be unjust and unreasonable to apply the same rule to both. If the rule applicable to railways maintaining stations, etc., were applied to a motor-bus, as above outlined, it would be necessary for the motor-bus company to maintain almost every sidewalk and street corner, where buses stop, in every city so that they could comply with this rule. Merely to state the proposition is to answer it." See also State Railroad Co. v. Boddy, 105 Tenn. 666, 58 S. W. 646.

The fact that the jury found that the bus driver, Beryl McCollum, had previous to the accident told plaintiff, as well as others, that if they reached the parked bus several minutes before its departure for them to get inside the bus out of the cold and wait until the driver arrived, would not in our opinion change the situation any since the plaintiff under the above authorities did not occupy the status of a passenger until he actually got onto the property of defendant, which in this instance, would have been the bus.

Defendant complained that the trial court erred in instructing the jury that the testimony of defendant's witnesses, Felix Ray and Glenn Long, could be considered only for the purpose of contradicting and impeaching plaintiff's witness, Ray Harrell. These two witnesses testified that after the accident, Ray Harrell came to defendant's terminal building and told of Williams having fallen over the wall; that Harrell stated out of the presence of plaintiff that Williams had sat down on the wall and had fallen over backwards. Defendant insisted that the above testimony should have been admitted in evidence against the plaintiff in that it constituted a part of the res gestae.

Declaration of bystanders to be admissible as part of the res gestae must be substantially contemporaneous

with the act to which they relate or so soon thereafter as to constitute a part of the transaction. The rule as stated by our Supreme Court in National Life & Accident Ins. Co. v. Follett, 168 Tenn. 647, 80 S. W. (2d) 92, 93, is as follows : "To be admissible as 'res gestae,' act or declaration must be substantially contemporaneous with main fact, must spontaneously spring out of it, and must tend to illustrate, elucidate, or characterize it."

In Tennessee Central Railway Co. v. Gleaves, Adm'x, 2 Tenn. App. 549, suit was instituted against the defendant Railroad for the wrongful killing of plaintiff's intestate. The evidence disclosed that after the party had been hit, and the train had stopped and backed up some four hundred feet and the engineer had alighted and walked back to the mail car, he replied to the question of the mail clerk that he had hit some one. This statement was held not admissible as a part of the res gestae, the court saying: "His (the engineer's) statement was neither voluntary nor spontaneous but was made in response to a question. It was a narrative of an act completed not the act describing itself in the statement. In our opinion, the statement was not a part of the res gestae."

█ Here, the statement allegedly made by Harrell was not contemporaneous with the main fact,—the fall of the plaintiff, Williams, over the wall—but was a narrative of the occurrence made some time thereafter. As such, the alleged statement could only be introduced for the purpose of impeaching Harrell, who testified differently during the course of the trial.

█ In Riverside Mill Co. v. Parsons, 176 Tenn. 381, 141 S. W. (2d) 895, 898, our Supreme Court said that a "trial judge possesses a large discretion in ruling on the competency of evidence offered as part of the res gestae."

■ By other assignments the defendant insists that the trial court erred in specific parts of the charge to the jury in which the court stated abstract principles of law which were taken from reliable text-books. Inasmuch as the parts of the charge complained about were sound law and applicable to the case being tried, we think that these assignments are without merit.

For reasons indicated, the trial court should have directed a verdict in favor of defendant. The judgment below will be reversed and the case dismissed.