MASON & DIXON LINES, INC., Appellant,

*v.*

HELEN HARTSOCK GREGORY et al., Appellees.

(*Knoxville,* September Term, 1959.)

Opinion filed April 6, 1960.

BEN C. DAVIS, WILLIAM H. CATE and PENN, HUNTER, SMITH & DAVIS, Kingsport, for appellant.

WM. S. TODD, Kingsport, for appellees.

MR. JUSTICE SWEPSTON delivered the opinion of the Court.

This is a suit under T.C.A. sec. 50-901 et seq., the Workmen's Compensation Law, filed by Mrs. Helen Hartsock Gregory, widow of Paul C. Gregory, deceased, for the benefit of herself and dependent children of the deceased. The chancellor allowed a recovery and the

employer has appealed and assigned 15 errors. In view of the conclusions we have reached in the matter, it will not be necessary to consider all of these assignments.

The deceased employee, hereinafter referred to as the deceased, was 47 years of age, had been working for the respondent trucking company, hereinafter sometimes called appellant, for more than 20 years and for the last several years had been an over-the-road driver of a White truck-trailer unit, hereinafter called the truck, on the route or run from the terminal of the appellant at Kingsport, Tennessee, to New Market, Virginia, and return. It is important to note here that near Pulaski, Virginia, there is what is known as the Dublin cutoff which bypasses a mountain and the Town of Pulaski, Virginia; this bypass is about 10 miles long, is a blacktop turtleback narrow, winding, bumpy road with many S curves; the bypass rejoins the main highway at a point about 30 miles west of Salem, Virginia; the fatal accident, hereinafter the subject of this discussion, occurred at a point near Salem.

The decedent left Kingsport terminal about 8:00 o'clock A.M. on the morning of November 19, 1957, driving one of these trucks on his regular run. Nobody knows whether he took the Dublin cutoff on this trip or not, the petitioner testified she did not know; he was seen by two men, Mayhew and Matthews, about 2:30 or 3:00 p.m. the same day at a Glenvar Texaco filling station, which point is 2 or 3 miles from Salem, Virginia. A very few minutes after the deceased left this filling station on the main highway he was observed by Matthews, who was in an automobile about 100 to 150 yards behind him, to run the unit off the highway to the right side at an angle of about 45 degrees, where the unit became mired in the

soft wet dirt. Matthews immediately went over to the unit, opened the door of the cab on the driver's side and found that the deceased was dead and was lying over to the right on the seat. From an autopsy made many months afterwards it was determined that the cause of death was arteriosclerosis.

The substance of the petition, for present purposes, is that the deceased drove said unit "up highway # 11 into Virginia, which is a major route for truck and tourist traffic, and which was congested with heavy traffic on said date, and part of said route was under construction with short detours, consisting of sharp turns and rough roads in the State of Virginia, and the Diesel fumes and exhaust fumes seeped into and entered the tractor unit which the deceased was driving, and these fumes which contained carbon monoxide and carbon dioxide, and said poisonous fumes in the closed cab of said tractor, combined with the strenuous physical exertion the nervous mental exertion of driving such a large and heavy piece of equipment over such rough terrain, in such heavy traffic, either put the deceased to sleep or into such a stupor that said tractor-trailer unit ran off the highway", etc.

The chancellor made a lengthy finding, the material parts of which are quoted herein. The chancellor at one point said:

"The record shows that the Dublin cutoff leading to and the road upon which the deceased was driving on that day consisted of sharp turns and a rough road in the State of Virginia."

Again the chancellor found:

"The record shows and the allegations made in the bill that the Diesel engine gave off fumes and exhaust fumes which seeped into and entered the tractor unit which the deceased was driving."

He further held that these fumes which are known to contain carbon monoxide and other poisonous fumes did seep into the cab of the truck and that these fumes combined with the strenuous physical exertion and the nervous and mental condition of the driver of a large piece of equipment such as this over rough terrain in heavy traffic affected the decedent's heart and caused him to run off the road and to be found dead.

The court further found that the deceased drove the truck over the Dublin cutoff and he laid great stress on the testimony of witness George Gilliam in the following language:

"The court further finds as a matter of fact, based upon the testimony of George Gilliam, 49, an experienced truck driver for 14 years, and the man who had driven a trailer-truck over the exact road in question in this lawsuit, that the road was crooked, narrow, rough and difficult to travel over.

The testimony of George Gilliam was, in effect, that he had driven for 14 years; that he had driven a truck for the Mason Dixon Company, that he had driven over the specific road in question in this case; that it was narrow and high in the middle and that it was difficult to hold the truck in the road.

It was his testimony that it required great physical strength, and that it was a strenuous job to drive a

tractor-trailer truck 45 feet in length with a Diesel engine heavily loaded with cargo over a road of that kind. Therefore, the court did give his testimony considerable weight in establishing as a fact in this record that it was a strenuous and difficult physical job, requiring great physical strength upon the driver.''

Further along in the opinion the court said again:

''The record shows that he went down a bumpy, rough, crooked, narrow highway with a tremendous cargo upon a 45-foot Diesel engine and trailer.''

Again the court said:

''The record shows further that other drivers had noticed these fumes and testified positively that they did exist. The record further shows that this was a narrow, curvy road, and the court therefore concludes, that the 47-year-old truck driver did die as a result of his employment within the scope of his employment,'' etc.

The first two assignments of error are that there is no competent evidence to support the findings and decree that there is no evidence to support the finding that the deceased sustained an injury by accident arising out of and in the course of his employment with the appellant.

■■ In order to discuss these first two assignments, it is first necessary to consider some of the assignments as to the alleged error in the admissibility of certain evidence. Assignments 4 and 7 relate to the testimony of the widow stating what her husband said to her on previous trips about the fumes in the cab bothering him. This evidence is set out verbatim in the assignments of error but need not be quoted here. The same was clearly incompetent. It is hearsay evidence; nor is it admissible

as a part of the *res gestae,* because it lacks spontaneity; in order for a declaration to be admissible as a part of the *res gestae,* it must be the spontaneous utterance of the mind while under the influence of the transaction or event. 32 C.J.S. Evidence sec. 417, p. 45, note 42, citing *Riverside Mill Co. v. Parsons,* 176 Tenn. 381, 141 S.W.2d 895; *National Life & Accident Ins. Co. v. Follett,* 168 Tenn. 647, 80 S.W.2d 92.

The word "spontaneity" is the opposite of being reflective.

■ The rules of evidence as to hearsay and *res gestae* apply in compensation cases. *Baxter v. Jordan,* 158 Tenn. 471, 14 S.W.2d 717; *Patton v. L. O. Brayton & Co.,* 184 Tenn. 592, 201 S.W.2d 981.

■ Declarations objectionable as hearsay are not rendered competent by the death of the declarant. *Campbell v. Henley,* 172 Tenn. 135, 110 S.W.2d 329.

There is no other evidence that fumes seeped into the cab of this particular truck on the occasion of the fatal incident or at any other time. The witness George Gilliam did testify that he had driven this same brand and type of Diesel White truck, that they have short tailpipes which run out behind the cab between the wheels and "well, if you drove off a hill it lets off fumes and it sucks all that back up through the transmission in on you." This witness did not testify, however, that he had ever driven this particular truck nor did he know anything about the conditions of the road or the wind and weather at this particular point where the truck ran off and the only other thing in the evidence is the testimony of the witness Matthews, who was following shortly behind the

truck just before it ran off the road, who was asked and replied:

"Q. Was that truck going fast or slow? A. Oh, no; he was moving probably 20 miles an hour and there's a little upgrade through there—a variation of grade. There is —I don't know probably what percentage it is but it's a little grade there."

Three or 4 question later when he was again asked about the speed, he said:

"Well now, when he topped the hill, there was another car or two that passed me and when he topped the hill, of course, he probably changed into a higher gear and he might have stepped it up but I couldn't say definitely."

Thus, in the absence of the testimony of the widow which was improperly admitted into evidence, any finding of fumes in the cab is obviously highly speculative and falls within the scintilla rule. As a demonstration of the correctness of this conclusion, and with no intention of weighing the evidence, as a matter of fact Matthews testified positively that when he got to the cab and opened the door the windows on each side were closed but that there were no fumes inside the cab.

■ Hence we must hold that there is no evidence to support the finding of the chancellor that there were fumes in the cab.

■ Assignment 14 relates to this testimony of George Gilliam about the location of the exhaust pipe and fumes, etc., the objection being on the basis that the evidence was not admissible unless the witness knew the condition of this particular tractor on that day. We think the evidence was not inadmissible for the reasons stated because

the witness was describing a condition common to all tractors of that type, but we think the evidence is of no value because it is limited to a condition going downhill without anything in the evidence to characterize how much grade is meant by downhill. It is necessarily a condition in any event that would be affected by the weather and the force and direction of the wind if any at that particular time, and there is nothing in the evidence with regard to the same.

As indicated heretofore, it is evident that the chancellor not only found that the deceased drove over the Dublin cutoff on that day but he gave that assumed fact great weight in reaching the conclusion that the deceased's heart was affected by reason of the nature of the road over which he drove.

No one knows whether the decedent went over the Dublin cutoff or not. The wife was permitted to testify that her husband had said to her at some indefinite time, "He said it was a good run, the roads were rough, and said the worst strip of the road was the Dublin cutoff just this side of Pulaski."

Obviously this was hearsay and not admissible for the reasons stated supra, and is the subject of assignment 5 which is sustained.

Assignment 6 complains of the admission of the testimony of Mrs. Gregory to the effect that on one occasion she drove in her automobile along part of this Dublin cutoff behind the truck as it was being driven by her husband. The objection was grounded on the point that the testimony was immaterial about the condition of the road as she described it on that occasion, because it was not at the scene of the alleged accident. This ob-

jection was not valid at that stage of the trial because, if it had been established in the record during the course of the trial that the deceased did drive over this cutoff, then this testimony would have been relevant in describing the condition of the road. The objection is, therefore, overruled on that ground.

■ Assignment 12 may be disposed of in the same manner because it relates to the testimony of George Gilliam describing the condition of this road as he drove a truck over it 5 months before this fatal accident; if there is any proof that the deceased used that cutoff on that day, the testimony would be competent in describing the condition of the road as it generally existed for whatever the testimony would be worth, with the right of the adversary side to show a change of condition during that next 5 months preceding the incident.

Assignment 13 relates to testimony of Gilliam admitted in evidence in which he testified that it takes much physical exertion to drive a big tractor over this stretch of road, i. e., the cutoff. This is overruled on the same basis as No. 12 above.

The difficulty and deficiency, however, in the proof about whether this cutoff was used lies in the fact that there is no evidence at all that these truck drivers were required to travel this Dublin cutoff. Nor was there any evidence that either the drivers generally or that the deceased always drove over this cutoff. George Gilliam did not so testify; in fact, he did not even attempt to testify that it was customary for the drivers to use this route; Mrs. Gregory did not so testify and with her hearsay testimony excluded supra, there is nothing left but speculation as to whether the deceased did drive over this cutoff on that trip.

■ Hence we must conclude that there is no evidence to support the finding of the chancellor that the heart attack could have been caused or contributed to in any way by any exertion in driving over said cutoff.

■ It seems appropriate at this time to discuss the question whether or not there is any medical testimony to support the decree of the chancellor. The autopsy was made by Dr. Harrison but he did not testify. The assignment of error objecting to the introduction of the autopsy report, which objection was based on the "best evidence" rule, is overruled for the simple fact that the autopsy was made by agreement of the parties, the appellant had a copy of same and could have produced it at the trial but did not do so; hence the copy in the hands of the petitioner was admissible.

■ The only doctor who did testify, Dr. John S. Powers, Jr., who was merely testifying as to what was disclosed by the autopsy report, was asked a hypothetical question which embraced the assumed fact that the deceased had driven over the Dublin cutoff. This was objected to as not stating all of the necessary material facts. The assignment of error relating to that point is overruled because when counsel objected that the hypothetical question was not complete, the burden was on him to point out to the court what had been omitted. *International Harvester Co. v. Sartain,* 32 Tenn.App. 425, 222 S.W.2d 854; 88 C.J.S. Trial sec. 124, pp. 249, 250, esp. note 37.

■ Nevertheless the form of the question was that the deceased drove this heavy unit with its load up the valley of Virginia "through what is known as the Dublin cutoff, which is narrow, winding, bumpy road up through

this congested highway with a great deal of traffic; and assuming further that the driving of this large tractor-trailer has connected with it a great deal of physical stress and strain and nervous tension'' driving under these conditions and in the condition in which the autopsy showed his heart to be whether this *could or might have hastened or accelerated or contributed to his death in that connection.* The doctor answered that it could. But on cross-examination he was asked negatively if it was not true that it could not have or might not have accelerated or contributed to his death, to which he answered that was also true. Thus the doctor really stated no opinion one way or the other; he did not commit himself.

This Court has recently distinctly held that this sort of testimony such as ''is possible'' or ''could be responsible'' is not alone sufficient on which to predicate a finding of a causal connection between the so-called accident and the injury for which compensation is sought. In the same case it is further said, however, that such testimony is not entirely without value if there be other evidence from which the trial judge may reasonably infer that the injury did so result from the accident. *Lynch v. La Rue,* 198 Tenn. 101, 104, 278 S.W.2d 85.

The difficulty in this case is, however, that there is no other evidence to support the findings of the chancellor. Referring back to what he said in his opinion, it will be recalled that he found two things that are not supported by the record, by competent admissible testimony: (1) that this man drove over the Dublin cutoff; and (2) that fumes escaped into the cab and that combined with the strenuous act of driving over that winding, crooked, twisting rough type of road brought about or contributed to the heart attack.

It will be specifically noted that the chancellor made no finding that anything that occurred on highway No. 11, considered by itself alone, caused or contributed in any way to the death. It will be observed that in *Coleman v. Coker*, 204 Tenn. 310, 321 S.W.2d 540, and in the cases cited on page 541, there is positive medical testimony in each of those cases to the effect that the activity in which the employee was engaged at the time caused or contributed or accelerated the heart attack.

We think our function is limited to the determination of whether or not there is any evidence to support the decree of the chancellor.

However, without going into too much detail, we will make the further statement that there is no proof whatever that highway No. 11 is narrow, crooked, winding, turtleback or any such description as fits the Dublin cutoff. It is a 3-lane highway, in fact, one of the main arteries of traffic in the State, 3 lanes wide and was unobstructed and without any detours, contrary to the allegations in the petition, and the only work going on so far as this record shows was the widening of the two sides of some of the bridges along the highway and the laying of a water line in the ditch on opposite side of the road, but traffic was flowing in both directions and Matthews, who was following this truck back about 100 to 150 yards behind, stated that as this truck went over the slight rise in grade, above mentioned, it was travelling about 20 miles per hour and continued to do so on a straightaway for several hundred yards until it gradually eased over the shoulder of the road and went off at an angle of 45 degrees; that there was no obstruction of any kind, no automobile or anything else that necessitated a

sudden stop or a sharp turn; and that when he opened the cab door and found the deceased across the seat dead, there were no contusions or abrasions of any kind or other evidence of trauma and that when the unit was pulled back on the highway and tested, there was nothing wrong with the mechanism.

It is the opinion of this Court that the finding and decree of the chancellor is not supported by any material evidence. We, therefore, find it necessary to reverse and dismiss the petition.