## ED SHELTON, Plaintiff in Error, v. STATE OF TENNESSEE, Defendant in Error.

### 460 S.W.2d 869.

Court of Criminal Appeals of Tennessee. Aug. 31, 1970.

Certiorari Denied by Supreme Court Nov. 2, 1970.

James G. Nave, Cleveland, for plaintiff in error.

David M. Pack, Atty. Gen., Arnold Peebles, Jr., Asst. Atty. Gen., Nashville, Earle G. Murphy, Asst. Dist. Atty. Gen., Cleveland, for defendant in error.

## OPINION

OLIVER, Judge.

Convicted in the Criminal Court of Bradley County of assault with intent to commit second degree murder, for which he was sentenced to imprisonment in the penitentiary for not less than one nor more than three years, Shelton is before this Court upon his appeal in the nature of a writ of error duly perfected.

By his first two Assignments of Error here the defendant challenges the sufficiency of the evidence to warrant and support the verdict of the jury. The law is well-settled in this State, and has been reiterated in numerous cases, that a guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State. Such a verdict removes the presumption of the innocence of the accused which stands as a witness for him until he is convicted, and raises a presumption of his guilt upon appeal, and he has the burden upon appeal of showing that the evidence preponderates against the verdict and in favor of his innocence. Gulley v. State, 219 Tenn. 114, 407 S.W.2d 186; Jamison v. State, 220 Tenn. 280, 416 S.W.2d 768; Webster v. State, Tenn.Crim.App., 425 S.W.2d 799; Brown v. State, Tenn. Crim.App., 441 S.W.2d 485.

The material evidence obviously accredited by the jury may be summarized briefly. After midnight on September 14, 1967, policemen on patrol in Cleveland, Ten-

nessee were directed by their headquarters to investigate a disturbance at the residence of Mrs. Mae McCormack. Officers Caylor and Brogdon reached the house first. There they observed the defendant's wife in a beaten and battered condition which she said the defendant inflicted, and saw him flee by a rear door and through a thickly overgrown back yard. These facts were related to Officers Cardin and Bogus when they arrived on the scene and they began patrolling the area in search of the defendant. Cardin was wearing uniform trousers and a white uniform cap with a badge on the front. Shortly thereafter, they saw the defendant running across a field or open space. Pursuing him on foot through a devious and elusive course, Officer Cardin finally overtook the defendant and called on him to stop and informed him that he was under arrest. "He stopped. I told him he was under arrest and he told me I wasn't taking him no damn place." The defendant began backing away, with his hand in his right pocket. With a small blackjack and a flashlight in his hand, this Officer approached the defendant "and kept talking and trying to get him to come on, that he was under arrest." The defendant suddenly lunged forward and grabbed Officer Cardin around the waist, bore him to the ground and got on top of him, wrenched his flashlight from his hand and proceeded to beat him over the head with it, telling him that he was going to beat his brains out, and inflicted many severe wounds requiring about 100 suture stitches and disabling him for two weeks. When officer Cardin began yelling for help, the defendant fled. Cardin then fired his revolver several times into the air to let the other officers know where he was. The place where this confrontation occurred, near the area firehall, was well illuminated by

street lights. Officer Bogus heard the shots, saw the defendant running from the area where Cardin was found and arrested him and took him into custody. The defendant had blood on his hands and on the front of his shirt. When Bogus told the defendant he was under arrest he began backing away and Bogus drew his gun and forced him into the patrol car, after which he and Officer Dailey took the defendant to jail. They did not strike or abuse or injure him in any way and he had no visible wounds of any kind.

Testifying in his own behalf, the defendant said that Mrs. McCormack was his wife's grandmother; that neither he nor his wife was at the McCormack home that night; that he was out late having new spark plugs installed in his car at a garage, then went to the Crow's Nest (a beer tavern) where he picked up his drunk brother-in-law and they returned to the garage to get a tire he had left there to be repaired; that when he came out of the garage this drunk brother-in-law, Lloyd Grissom, had driven his car away, and that he then started out walking in search of it; that as he was walking down 8th Street near the firehall he saw a man in uniform and with a white cap, whom he took to be a fireman, standing there with his arms crossed, that he did not know this man but said, "How do you do?" and about the same time the man struck him with a blackjack and "knocked me off the road, plumb off the road," without saying a word; that he then said to this assailant, "What the hell are you trying to do, kill somebody?" and that the man replied, "I am not trying to, I am going to"; that this man followed him as he started backing away and knocked him to his knees and began beating him on the head;

that he fought back and knocked his assailant down, but he jumped up and started striking the defendant with a flashlight; that he knocked this man down again and then jumped on top of him and was struck and cut on the nose and arm with the flashlight; that he asked this man, "What is wrong with you, are you crazy?" but he made no reply; that "I grabbed him by the wrist and the flashlight was headed toward his head like that, and when I got on top of him, he grabbed just like that and he would shove it at me and I would shove it back at him and it hit him in the head. I never had the light in my hand"; that he yelled for help as he saw a car go by, and then when he saw a patrol car going down the street he "picked Cardin by the wrists and gave him a sling" and then ran to the patrol car and got into the back seat before it was fully stopped; that Cardin shot at him twice as he ran; that he told Officer Bogus, who was driving the patrol car he got into, that someone was trying to kill him, that Bogus asked him where he was going at that time of night, and that he replied that he was going "right there" to get his car, which he said he saw parked on the street nearby; that Officer Bogus backed up and went over to where Cardin was and came back and said, "That was my buddy out there you beat up like that" and pulled his gun and threatened to shoot him and then struck him in the head with his gun several times and knocked him out, and that he knew nothing else until he got to the jail. Neither the defendant's wife nor his grandmother, Mrs. McCormack, was called as a witness.

◼ Confronted with the direct and irreconcilable conflict of the defendant's theory and testimony with that of the State, the jury by its verdict rejected the defendant's

version and account of the occurrence and gave credence to and accepted the State's theory and the testimony of the police officers. Manifestly, the defendant has failed to sustain the burden resting upon him here of demonstrating that the evidence preponderates against the verdict of the jury and in favor of his innocence.

There is no merit in the second and third Assignments of Error, which complain that it was prejudicial error to admit the testimony of police officers that when they arrived at the McCormack home the defendant's wife told them that he had beaten her. The defendant insists that this testimony was inadmissible as hearsay. Officers also testified that it was apparent from observation of Mrs. Shelton that she had been beaten. The officers were officially dispatched to that residence to investigate a reported disturbance. Their testimony as to what occurred upon their arrival there was nothing more or less than proper description of the facts and circumstances incident to and forming a part of the entire transaction—the transaction consisting of the investigation of the disturbance, Officer Cardin's pursuit and attempted arrest of the defendant and his assault upon Officer Cardin in the process. In this total context, the spontaneous statements made to the officers by the defendant's wife constituted part of the *res gestae* and were clearly admissible under that rule.

It is not possible to formulate a general rule as to what is or is not part of the *res gestae* which will be decisive of the question in every case. Tennessee Central Railway Company v. Gleaves, 2 Tenn.App. 549. The *res gestae* rule is not a mechanical one. Its application must be left in great measure to the sound judicial dis-

cretion of the trial court in each particular case. Tennessee Central Railway v. Gleaves, supra; Riverside Mill Co. v. Parsons, 176 Tenn. 381, 141 S.W.2d 895; Management Services, Inc. v. Hellman, 40 Tenn.App. 127, 289 S.W.2d 711.

Our Supreme Court said in Cooper v. State, 123 Tenn. 37, 124, 138 S.W. 826, 840, quoting with approval from Braswell v. State, 2 Shannon's Tenn.Cas. 595:

> " 'We apprehend that whatever was then and there said and done, immediately before or after the transaction, which is inseparably identified with and calculated to explain it, may be properly classified as part of the res gestae. The declaration in such a case is a verbal act, and does not stand for accusation, but stands for a fact.' "

And it is said in 1 Underhill's Criminal Evidence (5th Edition) § 266, p. 664:

> "Res gestae is from the Latin meaning 'things done,' and includes the circumstances, facts and declarations incidental to the main fact or transaction, necessary to illustrate its character, and also includes acts, words and declarations which are so closely connected therewith as to constitute a part of the transaction. The expression, res gestae, as applied to a crime, means the complete criminal transaction from its beginning or starting point in the act of the accused until the end is reached. What in any case constitutes the res gestae of a crime depends wholly on the character of the crime and the circumstances of the case.

> "The rule of res gestae, under which it is said that all facts which are a part of the res gestae are admissible,

is a rule determining the relevancy and not the character or probative force of the evidence. If the court determines that the fact offered is a part of the res gestae, it will be accepted, because, as it is said, that fact is then relevant. Relevancy is always a judicial question to be determined according to the issue which is to be tried."

■ Altogether baseless is the defendant's fourth Assignment of Error by which he complains of the admission in evidence of two pocket knives taken from his righthand front pocket in a search of his person at the time of his arrest by Officer Bogus. He had his hand in his right front pocket as he started backing away when Cardin told him that he was under arrest. Even if it be assumed that the defendant's possession of these knives was irrelevant to the issue of whether he assaulted Officer Cardin, it can be said affirmatively from this record that their admission did not affect the results of the trial and was, therefore, at most, only harmless error. (T.C.A. § 27-117.)

It is next contended that the trial court erred in declining to give in charge to the jury the following instructions specially requested by the defendant: "I charge you that if you find that the officer did not have information that a felony had been committed, then he did not have the right to use whatever force is necessary."

Another insistence, related to the last, is that since Officer Cardin had no warrant for the defendant's arrest the attempted arrest was illegal and the defendant had a right to resist and use whatever force was necessary to protect himself when the officer attempted to attack him with a blackjack.

■ Without question, it is the law of this State that an officer cannot arrest a person for a misdemeanor, not committed in his presence, without a proper warrant for such arrest. (T.C.A. § 40-803); State ex rel. Thompson v. Reichman, 135 Tenn. 685, 188 S.W. 597; Robertson v. State, 184 Tenn. 277, 198 S.W.2d 633. Where the officer has no right to make an arrest without a warrant, or if his warrant is not valid, he is a trespasser and acts at his peril. McQueen v. Heck, 41 Tenn. 212; Galvin v. State, 46 Tenn. 283; Poteete v. State, 68 Tenn. 261.

The gist of defense counsel's argument with reference to these contentions (Assignments of Error five and six) is that Officer Cardin acted illegally in attempting to arrest the defendant without a warrant for a misdemeanor not committed in his presence, and that the defendant had a right to resist such arrest by whatever force was necessary when he saw the officer armed with a black-jack.

Of course, this position is predicated upon two basic fallacies. In the first place, the material facts obviously found and determined by the jury, establishing the theory of the State and the credibility of the prosecution witnesses, does not comport with or support the defendant's asserted factual premise. On the contrary, this record clearly demonstrates that he suddenly assumed the offensive and viciously attacked a uniformed policeman (whose indicia of office—his uniform cap and badge—was plainly observable) who informed him that he was under arrest. Under this record, there is no room for doubt that the defendant knew that Cardin was a police officer, and so it is wholly immaterial that neither previously knew the identity of the other.

■ Secondly, the fact that Officer Cardin, proceeding without a warrant, was illegally attempting to arrest the defendant for a misdemeanor not committed in his presence, did not alone confer any right or license upon the defendant to assault and brutally beat up this officer nor furnish him any excuse for doing so.

■ We recognize and approve the general rule that every person has a right to resist an unlawful arrest, and that in preventing such illegal restraint of his liberty he may use such force as may be necessary. But that is not an unlimited right. "Necessary" is a relative term, depending on the circumstances of each case. Force may not be resorted to or means of resistance adopted which are disproportionate to the effort made to take him into custody. Bad Elk v. United States, 177 U.S. 529, 20 S.Ct. 729, 44 L.Ed. 874; Porter v. State, 124 Ga. 297, 52 S.E. 283; State v. Calhoun, 23 N.M. 681, 170 P. 750; Robison v. State, 53 Okl.Cr. 178, 9 P.2d 54; State v. Mobley, 240 N.C. 476, 83 S.E.2d 100; 4 Wharton's Criminal Law & Procedure, § 1668, pp. 303-305.

This limitation upon the right to resist an illegal arrest has been variously stated. In Bad Elk v. United States, supra, the Supreme Court of the United States expressed the rule as follows:

"If the officer had no right to arrest, the other party might resist the illegal attempt to arrest him, using no more force than was absolutely necessary to repel the assault constituting the attempt to arrest."

In Porter v. State, supra, the Supreme Court of Georgia said in 1905:

"While one who has committed a misdemeanor may use proportionate force in resistance to an illegal arrest, yet, if the means employed to prevent his detention are disproportionate to the effort made to take him into custody, such disproportionate resistance is unlawful."

The New Mexico Supreme Court said in State v. Calhoun, supra:

"Where an illegal arrest is made by an officer, the person arrested may resist the arrest or the continuation of custody thereunder, but not to the extent of excessive violence. 2 R.C.L. 'Arrest,' § 32; 1 Bishop's N.C.L. § 868."

The North Carolina Supreme Court stated the rule in State v. Mobley, supra:

"True, the right of a person to use force in resisting an illegal arrest is not unlimited. He may use only such force as reasonably appears to be necessary to prevent the unlawful restraint of his liberty. State v. Allen, [166 N.C. 265, 80 S.E. 1075,] supra. See also State v. Glenn, 198 N.C. 79, 150 S.E. 663. And where excessive force is exerted, the person seeking to avoid arrest may be convicted of assault, or even of homicide if death ensues, 4 Am.Jur., Arrest, Sec. 92."

In Robison v. State, supra, the Oklahoma Court of Criminal Appeals said this:

"In 2 R.C.L. 474, art. 32, the rule is stated:

'The right of a person to use force in resisting an illegal arrest is not unlimited. Unnecessary force may not be resorted to nor means of resistance

adopted which are disproportionate to the effort made to take him into custody.' "

In State v. Francis, 152 S.C. 17, 149 S.E. 348, the Supreme Court of South Carolina held that one about to be unlawfully arrested has no right to make a physical attack upon the officer seeking to make the arrest simply because he tells him to consider himself under arrest, or that he has a warrant for his arrest, and that in defending himself from an unlawful arrest a person has the right to use just so much force as is apparently necessary to accomplish his deliverance—and no more.

■ The question, purely factual, as to whether unnecessary and excessive force was employed by the other officer making the unlawful arrest, or by the person sought to be arrested illegally, is for the jury, as the triers of the facts, to decide under all the circumstances. The jury has resolved that issue by accepting Officer Cardin's testimony and rejecting the defendant's.

■ Lastly, the defendant complains in his seventh Assignment of Error that the trial court erroneously denied his motion for a new trial predicated upon the ground of newly discovered evidence that would impeach the testimony of Officer Cardin and show that there was no disturbance at the McCormack home on the night in question and that the defendant's wife was not there. Thus, the whole purpose of alleging newly discovered evidence as a ground for a new trial, and of the affidavits attached to the motion, manifestly was to impeach the testimony of prosecution witnesses. That is an insufficient basis for granting a new trial upon newly discovered evidence. Jones v. State, Tenn.Crim.App., 452 S.W.2d

365. Moreover, what we said in *Jones* with reference to the failure of the motion to meet the requirements for urging newly discovered evidence as a basis for a new trial is equally applicable here. The trial court did not err in denying the new trial motion upon that basis.

The judgment of the trial court is affirmed.

WALKER, P. J., and HYDER, J. concur.